**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **Audry L. Releford, Jr., Individually,** | § | |
| **and as Representative of the Estate** | § | |
| **of Kenneth Brian Releford** | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:14-cv-02810** |
| | § | |
| **City of Houston and Jason Rosemon** | § | |
| | § | |
| *Defendants* | § | |

**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

TO THE HONORABLE JUDGE KEITH ELLISON:

Defendants City of Houston and Jason Rosemon file their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, requesting that this Court dismiss with prejudice all of Plaintiffs' claims against them.

# TABLE OF CONTENTS

TABLE OF CITATIONS ...................................................................................................... iii

LIST OF EXHIBITS ............................................................................................................... v

I.    NATURE AND STAGE OF PROCEEDINGS .......................................................... 1

II.   SUMMARY OF ISSUES AND ARGUMENTS ....................................................... 1

III.  STATEMENT OF FACTS ......................................................................................... 1

III.  STANDARD OF REVIEW ...................................................................................... 13

IV.   ARGUMENT SUMMARY ...................................................................................... 14

V.    ARGUMENT ........................................................................................................... 14

A. Officer Rosemon is entitled to qualified immunity. ........................................ 14

    1.    Officer Rosemon is entitled to qualified immunity on Plaintiff's excessive force
          claim.......................................................................................................... 15

          (i)  Officer Rosemon's use of deadly force was objectively reasonable given the
          facts and circumstances at the time.................................................... 17

          (ii)    Officer Rosemon's use of force was objectively reasonably under
          established law. .................................................................................. 20

    (2)   There are no genuine issues of material fact......................................... 22

B. Releford cannot establish that the City of Houston is liable under 42 U.S.C. § 1983...... 27

    1.    No Failure to supervise/train. ................................................................ 28

    2.    No Failure to investigate/discipline. ...................................................... 32

C. Plaintiff is not entitled to the damages he seeks. ............................................ 34

    1.    Plaintiff's state law claims are barred by governmental immunity. .................... 34

VI.   CONCLUSION ........................................................................................................ 36

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Albertson v. T.J. Stevenson & Co.,* 749 F.2d 223 (5th Cir. 1984) ............................................. 23

*Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986)........................................................ 13

*Bazan ex rel. Bavan v. Hidalgo Cnty.*, 246 F.3d 481 (5th Cir.2001)................................ 15, 17, 18

*Brown v. City of Houston,* 337 F.3d 539 (5th Cir. 2003)....................................................... 13, 28

*Brumfield v. Hollins*, 551F.3d 322 (5th Cir.2008)....................................................................... 15

*Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) ....................................................... 19

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) .................................................................. 13

*City of Canton v. Harris,* 489 U.S. 378 (1989).......................................................................... 29

*City of Houston v. Rushing*, 7 S.W.3d 909, 914 (Tex. App.—Houston [1st Dist.] 1999 ............ 35

*City of Lubbock v. Nunez*, 279 S.W.3d 739, 742 (Tex. App.– Amarillo 2007 ........................... 36

*City of San Antonio v. Dunn,* 796 S.W.2d 258, at 261 (Tex. App.– San Antonio 1990.............. 36

*City of San Francisco v. Sheehan*, 135 S.Ct.,1765 (2015)..................................................... 20, 31

*City of Watauga v. Gordon,* 434 S.W.3d 586 (Tex. 2014)..................................................... 35, 36

*Clark v. American's Favorite Chicken,* 110 F.3d 295 (5th Cir. 1997) ...................................... 13

*Conkling v. Turner,* 18 F.3d 1285 (5th Cir. 1994)..................................................................... 13

*Connick v. Thompson,* 131 S.Ct. 1350 (2011) ......................................................................... 29

*Copeland v. Wasserstein, Perella & Co.,* 278 F.3d 472 (5th Cir. 2002) ..................................... 23

*District of Columbia v. Chinn,* 839 A.2d 701 (D.C. 2003)........................................................ 36

*Duckett v. City of Cedar Park, Tx.,* 950 F.2d 272 (5th Cir. 1992).............................................. 13

*Elizondo v. Green,* 671 F.3d 506 (5th Cir.2012) ...................................................................... 19

*Estate of Troy Davis v. City of North Richland Hills,* 406 F.3d 375 (5th Cir.2005) .............. 28, 29

*Evans v. City of Houston,* 246 F.3d 344 (5th Cir. 2001)............................................................. 13

*Fraire v. City of Arlington,* 957 F.2d 1268, (5th Cir.1992) ........................................................ 18

*Graham v. Connor,* 490 U.S. 386, 396 (1989) .......................................................................... 16

*Hamilton v. Seque Software,* 232 F.3d 473 (5th Cir. 2000)........................................................ 13

*Harris v. Serpas*, 745 F.3d 767 (5th Cir.2014) .................................................................... 17, 20

*Hathaway v. Bazany*, 507 F.3d, at 320 .................................................................................... 16

*Holland v. City of Houston,* 41 F.Supp.2d 678, (S.D. Tex. Jan. 7, 1999) ................................. 27

*Jett v. Dallas I.S.D.*, 491 U.S. 701, (1989) .............................................................................. 29

*Kariuki v. Tarango*, 709 F.3d 495 (5th Cir.2013)..................................................................... 23

*Meinecke v. H&R Block of Houston,* 66 F.3d 77 (5th Cir. 1995) .............................................. 13

*Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653 (Tex. 2008) .............................. 35

*Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir.2009) ......................................... 15, 18, 21

*Oporto v. City of El Paso*, 2012 WL 2191697, *5 (W.D.Tex. June 14, 2012).......................... 32

*Pearson v. Callahan*, 555 U.S. 223, (2009)......................................................................... 14, 16

*Peterson v. City of Fort Worth, Texas,* 588 F.3d  838 (5th Cir.2009) ............................... 28, 29, 33

*Pineda v. City of Houston,* 291 F.3d 32  (5th Cir. 2002) ............................................... 34

*Piotrowski v. City of Houston,* 237 F.3d 567 (5th Cir. 2001) ........................................ 27

*Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir.2012) ....................................... 15, 16

*Reata Constr. Corp. v. City of Dallas,* 197 S.W.3d 371 (Tex. 2006) ........................... 35

Rockwell v. Brown, 664 F.3d 985 (5th Cir.2011) .......................................................... 22

*S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489 (5th Cir. 1996) ................................. 23

*Saucier v. Katz*, 533 U.S. 194 (2001) .......................................................................... 14

*Scott v. Harris*, 550 U.S. 372, 380 (2007) ............................................................. 15, 23

*Snow v. City of El Paso,* F.Supp.2d 826 (W.D. Tex. 2006).......................................... 33

*Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994)..................................................... 21

*Tarver v. City of Edna*, 410 F.3d 745 (5th Cir. 2005)................................................... 16

*Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575  (Tex. 2001) ................................. 35

*Tex. Nat. Res. Cons. Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002) ...................... 35

*Thompson v. Johnson*, 348 Fed.Appx. 919 (5th Cir. 2009) ......................................... 14

*Thurman v. Sears, Roebuck & Co*., 952 F.2d 128 (5th Cir. 1992)................................ 23

United States v. Lawrence, 276 F.3d 193 (5th Cir.2001) .............................................. 22

*Washington v. Allstate Ins. Co.,* 901 F.2d 1281 (5th Cir. 1990)................................. 13

*Webster v. City of Houston,* 735 F.2d 838-842 (5th Cir. 1984)................................... 27

*Young v. Green,* 2013 WL 775388 (S.D. Tex. Feb. 28, 2013) .................................... 33

## Laws

42 U.S.C. § 1983.................................................................................... 1, 27, 28, 34

Tex. Civ. Prac. & Rem. Code § 101.021 (West 2012) ................................................. 35

Tex. Civ.Prac. & Rem. Code §71.021 ........................................................................ 34

Tex. Gov't Code § 311.034 (West 2013).................................................................... 35

# LIST OF EXHIBITS

Exhibit A – Deposition of Officer Rosemon

Exhibit A-1 – Officer Rosmeon's Certification Records

Exhibit A- 2 – Officer Rosemon's Complaint History

Exhibit A-3– Officer Rosemon 's Statement to the Homicide Division

Exhibit A-4–Officer Rosemon's Statement to the Internal Affairs Division

Exhibit B –Senior Police Officer George Guerrero's Report

Exhibit C – Assistant Chief Mattie C. Provost's Report

Exhibit D – Deposition Sergeant Steve Murdock

Exhibit E - Deposition of Officer Brian Evans

Exhibit E-1 – Officer Evans' handwritten notes

Exhibit F – Homicide Division File

Exhibit G- Deposition of Lieutenant John McGalin

Exhibit H – Deposition of Sergeant Terry Seagler

Exhibit I- Internal Affairs Division File

Exhibit J –Unsworn Declaration of Steven Roberts

Exhibit J-1 – Deposition of Steven Roberts

Exhibit K – Unsworn Declaration of Roy Abbs

Exhibit K-1 – Deposition of Roy Abbs

Exhibit L – Unsworn Declaration of Felicia Perry

Exhibit L-1 – Deposition of Felicia Perry

Exhibit L-2 – Audio Statement of Felicia Perry to the Homicide Division

Exhibit L-3 – Sworn Statement of Felicia Perry to the Internal Affairs Division

Exhibit M – Unsworn Declaration of Walter Hewell

Exhibit M-1 – Deposition of Walter Hewell

Exhibit N – Unsworn Declaration of Creola Scott

Exhibit N-1 – Deposition of Creola Scott

Exhibit O – Unsworn Declaration of Ray Abbs

Exhibit O-1 – Deposition of Ray Abbs

Exhibit P – Video Statement of Roger Abbs to the Homicide Division

Exhibit P-1 – Sworn Statement of Roger Abbs to the Internal Affairs Division

Exhibit Q – Report of Senior Police Officer Frank Webb

## I.      NATURE AND STAGE OF PROCEEDINGS

Audry Releford, Individually, and as Representative of the Estate of Kenneth Brian Releford, Deceased ("Plaintiff") contends that the City of Houston ("Houston") and Jason Rosemon ("Officer Rosemon"), collectively Defendants, violated Kenneth Brian Releford's ("Releford") civil rights pursuant to 42 U.S.C. § 1983. Specifically, Plaintiff complains that Officer Rosemon violated Releford's Fourth Amendment constitutional rights in using excessive force when he shot and killed Releford, and that the City has a custom, policy and practice of authorizing and allowing the use of excessive force as well as a failure to train and supervise its police officers, including Officer Rosemon.

On October 2, 2014, Plaintiff Audry L. Releford, individually and as representative of the Estate of Kenneth Brian Releford ("Releford") filed his Original Complaint against Defendants asserting violations of the Fourth and Fourteenth Amendments as well as a state law claim for failure to render medical care. (Doc.1).     On October 28, 2014, Defendants filed their 12(b)(6) Partial Motion for Dismissal seeking to dismiss Plaintiff's Fourteenth Amendment and state law claims.  (Doc. 9).  On December 15, 2014, the Court entered its order granting Defendants' Partial 12(b)(6) Partial Motion to Dismiss. (Doc. 14).  On  December 29, 2014, Plaintiff filed his First Amended Complaint. (Doc. 15).  On January 8, 2015, Defendants filed their Answer to Plaintiff's First Amended Complaint.  (Doc. 16).  On November 14, 2015, Plaintiff filed his Second Amended Complaint.  On December 11, 2015, Defendants filed their Answer to Plaintiff's Second Amended Complaint. (Doc. 67).  Discovery in this matter has been concluded, with the exception of expert depositions, and Defendants now move for summary judgment.

## II.      SUMMARY OF ISSUES AND ARGUMENTS

1.      Did Defendant Officer Rosemon establish that he is entitled to qualified immunity?

1

2.    If Defendant Officer Rosemon has established that he is entitled to qualified immunity, can Plaintiff rebut the defense and establish a necessity for trial?

3.    Is the City of Houston liable for the alleged constitutional violations because its customs, practices, policies or procedures were adopted with deliberate indifference and were the moving force behind alleged constitutional violations?

4.    Can Plaintiff establish a claim for damages?

## III.    STATEMENT OF FACTS

*BACKGROUND OF JASON OFFICER ROSEMON*

1.    Defendant Jason  Rosemon ("Officer Rosemon") is a police officer with the City of Houston Police Department ("HPD").  (Ex. A, p. 31).  Officer Rosemon attended training at HPD's Academy beginning May 25, 2010.   Ex. A, p. 22).  He was in Class 209.  *Id.* Officer Rosemon graduated from the Academy on November 30, 2010. *Id.*

2.    After graduating from the Academy in November 2010, Officer Rosemon was a probationary police officer for six months. (Ex. A, p. 24).  Officer Rosemon completed his probationary training period at the Midwest Patrol Division in May 2011.  (Ex. A, p. 25).  After completing his probationary training period, Officer Rosemon was assigned to the South Central Patrol Division. (Ex. A, p.32).  In October 2012, Officer Rosemon worked on the late side night shift from 11:00 pm to 7:00 am. (Ex. A, pp. 37, 49). Officer Rosemon was assigned to the 10H50 beat.  (Ex. A, p.38).  In October 2012, Officer Rosemon's chain of command included:  Sgt. Sweatt and/or Sgt. Sedita; the night shift lieutenant; Captain Yorek; and the Assistant Chief (Ex. A, pp. 54-55).

3.    Senior Police Officer George Guerrero is a trainer at the Academy and noted that Officer Rosemon received training on General Order 600-17, use of force. (Ex. B). The use of force policy is integrated into several other training classes.  *Id.*   There are other various aspects of law, the Texas Penal Code, Texas Criminal Code, and the U.S. Constitution that are in that Basic Peace Officer course that is required by the State.  *Id.* A true and accurate copy of Officer Rosemon's in-service training records are attached as Exhibit A-1.

4.    At the Academy, Officer Rosemon received extensive training in the classroom and in scenarios on the use of force policy.  (Exs. A, p. 167, B).  As of October 2012, Officer Rosemon received additional training in firearms, response to active shooter, peace officer field training, decision-making, and night time low light training. (Exs. A-1, B).

5.    Since 2007, all Houston police cadets are required by policy to receive Crisis Intervention Training ("CIT") at the 40-hour level. (Ex. C).  Officer Rosemon received the 40-hour CIT as part of the cadet class 209.  *Id.* The instructor would have covered general order 500-12  which addresses mental illness.  *Id.* After completing the 40-hour CIT class, officers in certain divisions/units such as patrol, are required to complete the Advanced CIT and the CIT update thereafter.  *Id* . On October 11, 2012, Officer Rosemon was within the Department's CIT training requirements. *Id.* Officer Rosemon would have

1

received training in de-escalation techniques based on active listening and communication. *Id.* Houston's CIT exceeds the State's mandate set by the Texas Commission on Law Enforcement ("TCOLE") and leads the nation in law enforcement response to the mentally ill. *Id.*

6.    Prior to Officer Rosemon's interaction with Releford, Officer Rosemon had received only one discipline, a written reprimand, for not filling out a tow slip authorization as part of the charges. (Ex. A, p. 196)(Ex. A-2).

*INCIDENT OF OCTOBER 10-11, 2012*

7.    On October 10, 2012, around midnight, Officer Rosemon was dispatched to 3409 Francis Street on a suspicious person call. (Exs. A, p. 56, A-3).   The dispatcher said the caller reported that someone had kicked in their door and assaulted people. *Id.*   Officer Rosemon was wearing his HPD uniform when he responded to the 911 call. (Ex. A, p. 185).

8.    Officer Rosemon received the call address on the mobile data terminal (MDT) in his police car. (Ex. A, p. 58).  Regarding weapons, the MDT stated "unknown/no weapons are involved." (Ex A., p. 69).  At 23:58, the MDT indicated that the suspect did not appear to have mental issues. (Ex. A, p. 73).

9.    At approximately 12:07 am, Officer Rosemon arrived at 3409 Francis Street, the complainant's, Roger Abbs ("Abbs") address. (Ex. A, pp. 60, 61).  Officer Rosemon saw Abbs sitting in the street in a wheelchair flagging him down.  (Ex. A, p. 62).  Officer Rosemon pulled up next to Abbs in front of Abbs' residence facing westbound. (Ex. A, p. 63). Roseomon did not see anyone else outside, on the street, or on their porch.  *Id.* Officer Rosemon remained in his vehicle and spoke to Abbs through his passenger side window.  *Id.*  Abbs told Officer Rosemon that someone had broken into his house and assaulted his elderly dad and two nephews.  (Ex. A, p. 64).  Abbs told Officer Rosemon that the suspect's name was "Kenny" and lived on Sampson Street in the third house.  *Id.* Abbs also told Officer Rosemon that Releford was wearing a brown shirt.  (Ex. A, p. 65). Officer Rosemon observed Abbs to appear frightened and frantic about what had happened.  (Ex. A, p. 66).  Abbs did not tell Officer Rosemon whether Releford had weapons.  (Ex. A, p. 67).  Abbs did not tell Officer Rosemon that Releford had mental illness.  (Ex. A, p. 70).  Officer Rosemon did not ask Abbs if Releford had mental illness because it did not appear on his MDT or the dispatcher never said anything about mental illness. (Ex. A, p. 72).   Officer Rosemon believed that Releford possibly had a weapon based on the nature of the crime Releford was reported to have committed. (Ex. A, p. 68).

10.    Officer Rosemon understood Releford to be in the vicinity and wanted to talk to him before he left the vicinity.  (Ex. A, p. 75).  Officer Rosemon did not plan on arresting Releford, but rather to investigate the matter.  (Ex. A, p. 77). Officer Rosemon proceeded to Releford's home based on what he was told by Abbs. (Ex. A, p.83). Officer Rosemon stopped his vehicle in the opposite lane of traffic closest to the house.  (Ex. A, p. 82).  At the third house, Officer Rosemon observed the door open and a light on inside. (Ex. A, p. 84).  Officer Rosemon did not see any movement inside the house. (Ex. A, p. 85).

*THE FIRST SHOT*

11.     Using the public address ("PA") or loud speaker in his patrol vehicle, Officer Rosemon asked if anyone was home. (Ex. A, p. 84).  Officer Rosemon then stated, "I need to speak with Kenny." *Id.* Officer Rosemon's only source of light was the headlights on his patrol vehicle. (Ex. A, p. 85).  Officer Rosemon observed the porch area of the fourth house to be dark.  (Ex. A , p. 87). Officer Rosemon saw the amber of a cigarette which indicated to him that someone was in that corner of the porch.  *Id.* Officer Rosemon then announced on his PA, "Are you Kenny?" (Ex. A, p. 91). Officer Rosemon asked a second time, "Are you Kenny?" *Id.* An angry and agitated voice responded, "Who the fuck want to know?"  *Id.* Officer Rosemon sensed the tension and attitude in the voice.  *Id.*  Officer Rosemon then stepped out of his patrol vehicle behind the driver's side door and raised his hands up.  *Id.*  Officer Rosemon stated "Hey, man, I'm not looking for any trouble, any problem.  I just want to talk to you." (Ex. A, p. 93).  Officer Rosemon was trying to calm the person down.  *Id.*  Officer Rosemon could see the person on the porch move towards the end of the porch.  *Id.*  Officer Rosemon observed Releford wearing a brown shirt as he walked down the porch stairs.  (Ex. A, p. 94).

12.     Officer Rosemon was looking at the right side of Releford and could not see Releford's left hand. (Ex. A, p. 95). Officer Rosemon could see Releford's right hand going back and forth from smoking,.  *Id.*  The distance between the house and street was approximately fifteen feet.  (Ex. A, p. 98).  As Releford walked down the porch with the cigarette in his right hand, Officer Rosemon could see him biting on his lip with a very angry face.  *Id.*  Officer Rosemon began to give verbal commands to Releford to stop and show his hands.  *Id.* Releford turned right as he came towards Officer Rosemon. *Id.* Rosmeon could not see Releford's left hand because it was behind his back.  *Id.*  Releford would not obey any of Officer Rosemon's verbal commands. (Ex. A, p. 100).  Officer Rosemon kept telling Releford to stop and show his hands.  *Id.* Officer Rosemon continued to see the cigarette in Releford's right hand and his left hand still behind his back.  *Id.* Releford was walking at a good pace, with a grimace on his face, biting his lip, keeping his hand behind his back. (Ex. A, pp.100, 139).

13.     As Releford approached the street, Officer Rosemon yelled, "Stop" and "Show me your hands." (Ex. A, p. 101).  Releford's right hand was still visible but his left hand remained behind his back.  *Id.*  Releford reached the bumper rail of Officer Rosemon's patrol vehicle.  (Ex. A, p. 102).  Officer Rosemon was still behind his driver's side door.  *Id.* Officer Rosemon was giving commands to Releford to stop, show his hand, and get on the ground.  *Id.*  As Releford continued to advance towards Officer Rosemon's car door from the bumper, Officer Rosemon drew his weapon.  (Ex. A, p. 105).  Officer Rosemon felt a threat of danger and drew his weapon because he believed that Releford may have possibly committed a felony, was not complying with his commands, closing the distance between them, keeping his left hand out of Officer Rosemon's sight, and had an angry look on his face as he bit his lip. (Ex. A, p. 107).   Officer Rosemon believed that Releford was concealing a weapon, possibly a deadly weapon.  (Ex. A, p. 237).

14.     As Releford closed the distance between himself and Officer Rosemon, Officer Rosemon began to backpedal and retreat. (Ex. A, p. 105).   At 12:08:58, Officer Rosemon notified

3

the dispatcher that he had, "One at gunpoint, 3300 Sampson." (Ex. A, p. 109). Officer Rosemon noticed that after talking on his radio, Releford became even angrier. (Ex. A, p. 106). Releford's pace picked up and his left hand was not visible. (Ex. A, p. 107). Officer Rosemon thought that Releford was going to kill him. (Ex. A, pp. 106, 107). Officer Rosemon believed that Releford had possibly committed a felony and could see the determined look on his face, his refusal to obey commands, keeping his left hand behind his back, and coming after Officer Rosemon. *Id.* Officer Rosemon backpedaled between seventy to eightyfeet. *Id.* Officer Rosemon was trying to create distance by back pedaling. (Ex. A, p. 107). The distance kept changing because as Officer Rosemon tried to create distance, Releford closed the distance. (Ex. A, p. 116). At this point, Officer Rosemon reached the corner of the intersection . (Ex. A, p. 118). From his periphery, Officer Rosemon saw a ditch on his right hand side. *Id.* Officer Rosemon could not back pedal any farther because of the ditch and had nowhere else to go. *Id.* Releford still had the angry look on his face and would not show his left hand. *Id.* Officer Rosemon began to plead with Releford, "Kenny, please stop, man. Please stop." *Id.* Officer Rosemon believed that Releford had possibly committed a felony and Releford was refusing his verbal commands as he was backing up. *Id.*

15.   Officer Rosemon kept thinking that because Releford may have possibly committed a felony, was refusing his verbal commands that Releford was going to kill him if he got the chance. (Ex. A, pp. 118, 119). Officer Rosemon and Releford were less than five feet apart. (Ex. A, p. 126). Officer Rosemon had nowhere else to step because of the ditch as Releford continued to approach him. *Id.* Releford was right in front of Officer Rosemon and Officer Rosemon still could not see Releford's hand. (Ex. A, p. 120).

16.   Officer Rosemon continued to give verbal commands to Releford to show his hands and stop. (Ex. A, p. 132). Officer Rosemon heard voices saying, "Stay down, leave that officer alone. Kenny leave that officer alone." *Id.* Officer Rosemon did not hear anyone say that Releford had mental issues. (Ex. A, p. 133). Officer Rosemon had no idea of Releford's mental issues. *Id.* Officer Rosemon was focused on the threat approaching him with Releford's left hand behind his back and a determined look on Releford's face like he wanted to harm or kill Officer Rosemon. (Ex. A, p. 134). Officer Rosemon thought Releford had a weapon. *Id.*

17.   Officer Rosemon leaned back in order to shoot Releford and stop his advance. (Ex. A, p. 126). By leaning back, called hip shooting, Officer Rosemon was able to create more distance so his gun was not where Releford could take it from him. (Ex. A, p. 188).

18.   After being shot, Releford stopped for a moment and bent forward still keeping his left hand behind his back. (Ex. A, p. 120). Releford did not fall to the ground. *Id.* Releford slumped down with his left hand behind his back. (Ex. A, p. 135). At 12:09:14, Officer Rosemon notified the dispatcher, "Shots fired" and to send paramedics. (Ex. A, pp.127, 225). Officer Rosemon still could not see Releford's left hand. (Ex. A, p. 134).

*THE SECOND SHOT*

4

19.    After being shot, Releford grimaced for a second. *Id.* Within moments, Releford popped back up and advanced even faster towards Officer Rosemon. (Ex. A, pp. 120, 134). Releford was standing up straight coming towards Officer Rosemon. (Ex. A,p. 138). Officer Rosemon immediately notified the dispatcher, "He's back up." ((Ex. A, pp. 120, 127). Officer Rosemon could see the cigarette in Releford's right hand but Releford kepthis left hand behind his back. (Ex. A, pp. 120, 121). Officer Rosemon did not have time to do anything else but retreat and try to create distance. (Ex. A, p. 134). Officer Rosemon changed direction and began to backpedal in order to keep his eyes on Releford. (Ex. A, p. 121). Officer Rosemon still did not know if Releford had a weapon behind his back. (Ex. A, p. 122). Officer Rosemon thought if he turned his back and ran, Releford would be able to shoot him in the back. *Id.*

20.    Releford's advanced so fast, Officer Rosemon was not able to create any distance. (Ex. A, p 124). Officer Rosemon was moving at a fast pace because he was running for his life because he still could not see Releford's hands. ((Ex. A, p. 125). Releford was still a threat to Rosmeon because his left hand was behind his back and he was advancing. (Ex. A, p. 132). Officer Rosemon and Releford were in the middle of the intersection of Sampson and Francis streets. (Ex. A, pp. 129, 130). Officer Rosemon shot Releford because he thought Releford was going to kill him. (Ex. A, p. 125).

21.    At 12:10:24, Officer Rosemon told the dispatcher "51 shots fired again. He down." (Ex. A, p. 136). After the second shot, Releford fell to the ground with both hands balled up in a fist.. (Ex. A, pp. 137, 138). Releford was still moving around fighting to get up. *Id.* When Releford hit the ground, he made growling sounds and was lying on his back. (Ex. A, p. 235). Officer Rosemon finally saw Releford's left hand. (Ex. A, pp. 139, 235). Releford did not have any weapons. (Ex. A, p. 236). Officer Rosemon heard voices saying, "Kenny, leave that officer alone. Just stay down. Please stay down." (Ex. A, p. 139). Releford was fighting to get back up and swinging at the air. *Id.* Officer Rosemon did not handcuff Releford because he knew the ambulance was on its way and he did not want to make things worse for Releford by causing him to bleed out more. (Ex. A, pp. 139, 234).

22.    Officer Rosemon shot Releford in order to protect himself both times since he believed Releford was going to kill him. (Ex. A, p. 140). At no point that night did it ever occur to Officer Rosemon that Releford suffered from mental illness. (Ex. A, p. 176). Releford's refusal to listen to Officer Rosemon's commands was not an indication of mental illness. (Ex. A, p. 181). Throughout the entire incident, from when Officer Rosemon first saw Releford coming down from the porch, Officer Rosemon believed Releford had a weapon because he would not obey his commands to show his hands. (Ex. A, p. 185,190).

23.    Investigators from Houston's Homicide and Internal Affairs Divisions, and representatives from the Harris County District Attorney's office arrived. (Ex. A, p. 146). Officer Rosemon did a step by step walk-through with all the investigators. (Ex. A, p. 147). After the walk-through was over, Officer Rosemon went to the Homicide Division and typed his statement by himself from memory. (Ex. A, p. 152). Rosemon was subsequently contacted by the Internal Affairs Division ("IAD") and provided a list

of questions for him to answer.  (Ex. A, p.  155).  Officer Rosemon referred to his Homicide statement and typed the rest of the IAD statement from memory.  *Id.*

*HOMICIDE INVESTIGATION*

24.     Sergeant Steven Murdock ("Sgt. Murdock") in the Homicide Division was assigned to conduct an investigation into the events which form the basis of this lawsuit.  (Ex. D, p.36).  Sgt. Murdock has been with HPD in 1992.  (Ex. D, p. 25).  Sgt. Murdock was assigned to the Homicide Division on September 1, 2012, having previously been assigned to special operations.  (Ex D, p.26).  Sgt. Murodck's role in investigating this shooting was to gather objective facts and investigate the case.  (Ex. E, pp. 43, 46).  The Civil Rights Division of the Harris County District Attorney's Office determines whether a shooting is justified.  (Ex. E, p. 45).   Sgt. Murdock makes no recommendations at all. *Id.*

25.     The walk-through was comprised of fourteen other people including the IAD, District Attorney, Sgt. Murdock's Captain and Lieutenant.  (Ex. E, pp. 75,77).  Officer Rosemon went through the incident step by step.  (Ex. E, p. 81).  The walk-through started at the Abbs house. (Ex. E, p. 81).  Officer Rosemon told them told them how the incident unfolded, when he got there, who he spoke to, and what he did.  (Ex. E, p. 82).  The walk- through lasted about an hour. (Ex. E, p. 85).

26.     Sgt. Murdock found two spent shell casings and blood.  (Ex. E. p. 89).  He spoke to Warren Abbs, Demarcus, Tyrese Sutton, and Roger Abbs.  (Ex. E, p. 90). Sgt. Murdock knocked on all the doors and spoke to the people that were standing outside.  (Ex. E. p. 95).  Nobody answered the doors.  *Id.*  He spoke to a female who said she saw what had happened.  *Id.*  She was the only person he found who actually saw what had happened. (Ex. E, p. 96).   If a person indicated they were in bed when they heard the gunshots, they could not be eyewitnesses.  (Ex. E, p. 96).

27.     After canvassing the scene area, Sgt. Murdock went to the Abbs house to get statements. (Ex. E, p. 103).  After leaving the scene, Sgt. Murdock and Officer Evans went to Ben Taub Hospital.  (Ex. E, p. 115).  Sgt. Murdock returned to HPD and started the paperwork, including the Attorney General report. (Ex. E, p. 109).   The Homicide case file is sent to the District Attorney who makes the final determination on the case.  (Ex. E, p. 118).  The District Attorney determines whether this is a justifiable homicide.  (Ex. E, p. 146). Sgt. Murdock included sexual assault of a minor in the offense category of his report because it happened but he did not believe that Officer Rosemon knew that at the time.  (Ex. E, p. 120). The District Attorney's office no billed the case.  (Exs. D, p. 148, Ex. F)

28.     When Sgt. Murdock saw Releford's body in the hospital, he was nude.  (Ex. E, p. 150). He did not realize that his clothing has been saved.  *Id.*

29.     Officer Bryan Evans ("Evans") was Sgt. Murdock's partner.  (Ex. E, p.21).  Evans graduated from the Academy in 1994.  (Ex. E, p. 16).  Evans has been in the Homicide Division for ten years.  (Ex. E, p. 18).   Officer Evans made handwritten notes of his

informal conversation with Roger Abbs on October 11, 2012.  (Exs. E, p. 105, E-1).
Officer Evans noted that Abbs told Officer Rosemon where Releford lived and saw
Officer Rosemon go there.  (Exs. E, p. 109, E-1).  Officer Evans wrote, "Kenny just kept
coming, the officer shot him, Kenny kept coming at the officer, and the officer shot him
again." *Id.*  He also wrote, "I could see Kenny coming out of the ditch coming at the
officer in an aggressive manner at the officer." (Exs. E, p. 110, E-1).  They did not do any
forensic testing of Releford's clothes because it was an officer involved shooting and
they knew the officer shot Releford.  (Ex. E, p. 126).

*INTERNAL AFFAIRS INVESTIGATION*

30.  Lieutenant John McGalin ("Lt. McGalin") graduated from the Academy in 1996. (Ex. G,
p.21). He transferred to IAD in 2012.  (Ex. G, p.24). In an officer shooting, his job is to
investigate and find out whether it was justified departmentally and report that to his
supervisors. (Ex. G, p. 37).  The sergeant goes out, conducts the investigation, and
provides him the information.  *Id.* He then writes a synopsis of the investigation and
evaluates whether HPD policies and procedures were adhered to by the officers involved
in the shooting.  *Id.*  His Captain, Captain Zera, at that time reviewed his synopsis. (Ex.
E, p. 38).  After the Captain reviewed it, the case went to the Assistant Chief and then to
the Independent Police Oversight Board ("IPOB"), a citizen review board, or the AED,
an internal review board.  (Ex. E, p. 39).

31.  Chief Provost was Captain Zera's supervisor, Assistant Chief Michael Dirden was Chief
Provost's supervisor, and Charles McClelland was Assistant Chief Michael Dirden's
supervisor. (Ex. G, p. 47).  Sergeant Seagler was the on call sergeant in this incident. (Ex.
G, p. 52).  He would check periodically with Sergeant Seagler. (Ex. G, p. 54).

32.  Officer Rosemon obtained information that a felony offense had been committed.  (Ex.
G, p. 70).  It was of no consequence to Lt. McGalin whether Officer Rosemon spent a
minute or five to ascertain the information.  *Id.*  Whether the suspect had mental issues
was also not important because mental issues does not change the fact that the suspect
was threatening a HPD officer by coming at him, and the officer's actions required him to
eliminate a threat.  (Ex. G, p. 71).

33.  In his report, Lt. McGalin he noted that Releford had an aggressive and deliberate walk,"
which meant that Releford was walking with a purpose and not meandering, walking
away, or loitering according to Officer Rosemon's statement.  (Ex. G, p.75).  Lt. McGalin
understood that Releford lunged at Officer Rosemon.  (Ex. E, p. 76).  Lieutenant
McGalin noted that after the first shot, Officer Rosemon paused, reassessed the situation,
and realized that the threat was still imminent because Releford was still advancing and
closing distance on him. (Ex. G, p. 79).   Based on the dispatch tapes, Lt. McGalin
believed it was about a minute between the shots.  (Ex. G, p. 80).  Lt. McGalin did not
see any evidence or indication that Releford fell between the two shots.  (Ex. G, p. 82).
Lt. McGalin stated that because the two shots were within a five to six inch circle and
have the same trajectory, that indicated to him that Releford was in the same posture from
one shot to the other.  (Ex. G, p. 83).  Both shots have roughly the same trajectory.  *Id.*
Lt. McGalin had reason to believe that Officer Rosemon feared that Mr. Releford had a

7

weapon but had no way of knowing what Releford was concealing behind his back. (Ex. G, p. 85). He concluded that Officer Rosemon's discharge of his fireman/citizen death was intentional justified. (Ex. G, p. 87).

34.    Sergeant Seagler (Sgt. Seagler") graduated from HPD's Academy in March 2000. (Ex. H, p. 36). He transferred to IAD in 2009. (Ex. H, pp. 42, 43). As an IAD sergeant, he would go to the location, meet with an Assistant Chief to let them know he was there representing IAD. (Ex. H, p. 62). He was part of the walk-through. *Id.* At the scene, Sgt. Seagler does not ask questions or talk to witnesses. *Id.* Pursuant to the Local Gov't Code, an officer cannot be interrogated without a 48 hour notice or waiver of that notice. (Ex. H, p. 63). There are three investigations, Homicide Division, District Attorney from the County, and IAD. (Ex. H, pp. 65, 66). Homicide Division does the criminal investigation and he does the administrative investigation looking to see if there were any policy violations. (Ex. H, p. 66).

35.    Sgt. Seagler recalled the walk-through beginning at Francis and Sampson. (Ex. H, p. 97). Officer Rosmeon appeared shook up, distraught, and had gone through something very emotionally difficult (Ex. H, p. 107). Officer Rosemon said that Releford was at the doorway, was coming after him, and hewas giving commands to Releford to stop. (Ex. H, p. 100) Sgt. Seagler recalled Officer Rosemon saying that he pled with Kenny to stop and he walked backward to show everyone how far hebackpedaled before firing his weapon. *Id.* Sgt. Seagler stated that Officer Rosemon said Releford refused to show his hands. (Ex. H, p. 102). He recalled Officer Rosemon saying that the first shot caused Releford to pause. (Ex. H, p. 103). Further, Sgt. Seagler understood that after being shot, Releford hunched and bent over. (Ex. H, p. 105).

36.    The administrative side of the IAD file contains information on the officer. (Ex. H, p. 120). As part of his investigation, Sgt. Seagler went back to canvass the area and look for more witnesses. (Ex. H, p. 110). His report included that Releford forced entry into a neighbor's residence and sexually assaulted a juvenile based on one of the statements. (Exs. H, p. 138, I). According to Sgt. Seagler, the sexual assault was included in his report because it actually occurred. (Exs. H, p. 139, I). His report is reviewed by his Lieutenant, the Captain of Internal Affairs, the Assistant Chief of Professional Standards Command, and the Chief of Police. (Exs. H, p. 143, I).

37.    Sgt. Seagler stated that Officer Rosemon did not violate any HPD policies by not investigating the scene at Abbs' house. (Ex. H, p. 149). When Abbs told Officer Rosemon his house had been broken into, it was taken at face value for the time being. *Id.* If there was a suspect still there, the priority is still the suspect. *Id.* It would be much worse to not try to capture the suspect than to verify that a door had been kicked in. *Id.* The priority would be to go find the suspect even if the suspect was known to be in his home because the suspect is the priority. (Ex. H, p. 149). If he hurt one person, he can hurt others. *Id.* The allegation was burglary so Officer Rosemon had to go deal with that suspect. *Id.*

38.    Sgt. Seagler did not recall if medical services were called and it would not have been a policy violation if it had not. (Ex. H, pp. 150, 151). If it were obvious that a assistance

8

was needed then it would have been done.  (Ex. H, p. 151). Sgt. Seagler noted in his investigation that Releford was within two feet from Officer Rosemon when Officer Rosemon discharged his weapon based on the statements.  (Exs. H, p. 159, I).

39.    Sgt. Seagler made numerous attempts to talk to Abbs. (Exs. H, p. 149, I). Sgt. Seagler observed that Abbs had a glaring eyesight issue, a dark discoloration in his right eye. (Exs. H, p. 171, I). Sgt Seagler took four photographs with Abbs indicating Abbs' location during the incident.  (Exs. H, p. 171, H-1). Sgt. Seagler took measurements and made notes in the photographs.  (Ex. H-1). The distance from where Abbs said he was when he first saw Officer Rosemon fire his weapon was 130 feet down Francis Street. (Exs. H, pp. 202, 203, H-1).

40.    Sgt. Seagler also obtained a second statement from Felicia Perry ("Perry") because she was probably the closest to the shooting.  (Exs. H, p. 179, I, L-3).  Perry only saw the second shooting.  *Id.*

41.    According to Sgt. Seagler, all the statements indicated that Releford was trying to kill or injure or do whatever he could to get killed.  (Ex. H, p. 227). Officer Rosemon backpedaled and retreated and did everything to avoid shooting Releford until the last possible second.  (Ex. H, p. 228).  Sgt. Seagler also stated that the size of a person does not mean anything.  (Ex. H, p. 230).   Releford's aggression determined Officer Rosemon's actions.  *Id.*

*2012- 2013 WITNESS STATEMENTS*

42.    Felicia Perry ("Perry") provided an audio statement to the Homicide Division on October 11, 2012.  (Exs. F, L-2).  In her audio statement, Perry stated that after hearing the first shot, she went outside.  *Id.* From where she was standing, she could see Releford had his hand behind his back.  *Id.* She heard the officer tell Releford, "don't move," "don't come forward," and that Releford's hand was behind his back when Officer Rosemon shot him. *Id.*

43.    On January 7, 2013, Perry provided a sworn statement to the IAD Investigator.  (Exs. I, L-3).  In her statement, Perry said she heard the first gunshot and then walked outside. *Id.* Releford was standing in the street to her right.  *Id.*  She could clearly see from her porch that Releford had a hand behind his back.  *Id.*  She saw the officer walking backwards with Releford approaching him. .  *Id.*

44.    Abbs provided a video statement to the Homicide Division on October 11, 2012.  (Exs. F, O).  Abbs stated that he told Officer Rosemon where Releford lived.  *Id.*  Officer Rosemon asked Releford to come out of the house and Releford came at the officer.  *Id.* Abbs stated that Officer Rosemon told Releford to "get down, get down and stop" but Releford just kept coming.  *Id.*  Abbs stated that he heard the firstshot and Releford kept coming at Officer Rosemon.  *Id.*  Abbs stated that Officer  Rosemon then shot Releford again.  *Id.*  Abbs stated that he saw Releford coming out of the ditch, coming at Officer Rosemon in an aggressive manner. *Id.*

9

45.    On January 5, 2013, Abbs provided a sworn statement to the IAD Investigator.  (Ex. O-1).  Abbs stated that he pointed out Releford's house to Officer Rosemon.  *Id.*  Abbs was in front of his own house with his back turned. *Id.*  Abbs saw  Releford  coming  at Officer Rosemon and Officer Rosemon telling Releford to "get down,       get down and stop."  *Id.*  Abbs stated that Releford kept coming and then he heard a        warning  shot. *Id.*After  the  shot,  Releford  just  stood  there  and  then  started  coming  at  Officer Rosemon.  *Id.*  Abbs stated that Officer Rosemon told Releford to get on the ground when he heard a second shot.  *Id.*  Releford fell to the ground. *Id.*

*2015 UNSWORN DECLARATIONS*

46.    Steven Roberts ("Roberts") executed an unsworn declaration on February 21, 2015. (Ex. J-1). Roberts testified on October 4, 2015, that: the words in the declaration were his exact words and that he dictated them to the attorney; he was first contacted by Plaintiff's counsel a few days before signing his declaration statement; from his viewpoint he could only see Releford's right side and not the left side; Releford fell on his back after the first shot; and Releford remained in the same position for each shot.  (Ex. J).

47.    Roy Abbs executed an unsworn declaration on February 19, 2015. (Ex. K-1).  Roy Abbs testified on October 23, 2015, that: the unsworn declaration were  his  exact  words; he met Plaintiff's counsel the first time a week before signing the unsworn declaration; he was on Juanita Perry's porch (3410 Francis, Ex. L), about 70 feet away; he  heard Officer Rosemon tell Releford to stop and lay down; Releford was within a couple feet of Officer Rosemon; Releford complied with Officer Rosemon's command and lied down on his stomach; as Releford tried to push himself up, Officer Rosemon shot him; Releford again tried to push himself up and Officer Rosemon shot him.  (Ex. K).

48.    Perry executed an unsworn declaration February 22, 2015. (Ex. L-1). Perry testified in her deposition on October 30, 2015, that: the unsworn declaration were her exact words that she dictated to Plaintiff's counsel; she signed her unsworn declaration the same day she met Plaintiff's counsel for the first time; she only witnessed the second shot; she saw Releford's right hand but did not see his left hand; Releford's left hand was behind his back after the first shot; Releford was walking towards Officer Rosemon; and Officer Rosemon was giving commands to Releford. (Ex. L).

49.    Walter Hewell ("Hewell") executed an  unsworn declaration February 19, 2015. (Ex. M-1).  Hewell testified on October 22, 2015, that: the unsworn declaration were his exact words that he dictated to Plaintiff's counsel; he first met Plaintiff's counsel a week before signing the unsworn declaration; he saw Releford from behind Perry's parked car on Francis Street; he heard OfficerRosemon tell Releford to stop and to get down to the

ground before the first shot; and he did not see Releford fall to the ground after the first shot but assumed he did; after the first shot, Releford and Rosemon were face to face; and he did not see Releford fall to the ground after the second shot.  (Ex. M).

50.   Creola Scott ("Scott") executed an unsworn declaration March 20, 2015.  (Ex. N-1). Scott testified on October 23, 2015, that: the unsworn declaration were her exact words to Plaintiff's counsel; she first met Plaintiff's counsel in March 2015; Officer Rosemon and Releford were apart the entire width of Francis Street and remained in the exact positions for each shot; after the first shot, Officer Rosemon told her to be still as she tried to get closer after hearing Releford ask for help; after the second shot, Releford was on his stomach and   then turned to his side and grabbed   himself.  (Ex. N).

51.   Ray Abbs executed an unsworn declaration on October 15, 2015. (Ex. P-1.). Ray Abbs testified on November 6, 2015, that: he first met Plaintiff's counsel on October 11, 2015, at this brother's house; those were his words in his unsworn declaration; when he  came outside on his porch, Roy Abbs told him that Releford had  been  shot; he  saw  Releford after the second shot from 30 feet away lying on his stomach with his hands above him. (Ex. P).

*HPD POLICIES AND PROCEDURES*

52.   The policymaker for HPD is the Chief of Police.  (Ex. C).  The Chief approves all general orders.    *Id*.  The General Orders are written policies and procedures that provide structured guidance to officers on how to effectively handle anticipated events and also provide a means of channeling an employee's discretionary response to unanticipated events.  *Id*.  The general orders reflect commonly accepted law enforcement standards. *Id*.  Cadets are provided with a copy of all of HPD's General Orders.  *Id.* The cadets review some of the General Orders during their Academy training.  *Id.* After they leave the Academy, officers are provided updates periodically to the General Orders.  *Id*.  The General Orders are also located online.  *Id.*  Officers are notified of new General Orders by e-mails, circulars, roll call, and bulletins. *Id.*  Officers at all times are held accountable for having knowledge of the General Orders.  *Id.* Officers are aware that if they are found to have violated rules or General Orders, they are subject to discipline ranging from a written reprimand, suspension days, and termination.  *Id.*

53.   HPD General Order 600-17 sets forth HPD's policy on use of force. (Exs. B and E).   The policy allows the officer to have discretion as to when he can use force.    *Id.*   If     the officer feels his or someone else's life is in danger from imminent threat of serious bodily injury or death, then the officer is authorized to use deadly force.  *Id*.   Officers must consider their immediate surroundings and the safety of uninvolved citizens before using deadly force. *Id.* There are approximately 5300 police officers in the Houston Police Department.  *Id.* More than half of all police officers are patrol officers.  *Id.*

11

54.     HPD has a Personal Concerns Committee as described in HPD General Order 300-24. *Id.*   Officers who need closer supervision or a supervisor who observes an officer repeating the same infraction or negative behavior are identified and referred to the Committee. *Id.*   If an officer has four or more IAD complaints in a 12 month period, including use of force complaints, but not administrative complaints, then the officer is identified and referred to the Committee. *Id.*

*HPD TRAINING*

55.     The Chief of Police approves all changes in training.  (Ex. C).   HPD requires officers complete all required training on an annual basis.  *Id.*   HPD's annual training requirement is 40 hours while the State requires only 20 hours annually. *Id.*  The HPD Academy curriculum either meets or exceeds the        requirements for training set out by the State licensing board, Texas Commission On Law Enforcement ("TCOLE"). (Ex. B).

56.     Applicants to HPD must meet requirements set by TCOLE which includes thorough background investigations, psychological clearance, and medical clearance. (Ex. C). HPD also requires applicants to have successfully completed 48 hours of college credit, which the State does not require.  *Id.*  The cadets receive the Basic Peace Officer training at the Academy including use of force and mental illness. (Ex. C).  Other courses include laws of arrest, search and seizure, the Texas Code of Criminal Procedure, the Texas Penal Code, and the U.S. Constitution. *Id.* Training in these areas are generally provided by the Harris County Assistant District Attorneys.  *Id.*  Cadets also go through field training problems prior to graduating from the academy.  *Id.*  Upon successful completion of the Academy training curriculum, the cadets are called probationary police officers ("PPO") and are placed in the Department's Field Training program where they are paired with experienced field training officers.  *Id.* There are seven different phases of field problems. *Id.* The field trainer closely supervises and evaluates the PPO and provides immediate feedback in an on-the-job setting.  *Id.* The PPO's performance is critiqued on a daily basis and remedial training is provided for any perceived problems.  *Id.*  The Field Training Program lasts from four to six months depending on the need for remedial training.  *Id*. If a probationary police officer cannot successfully complete the Feld Training Program, he/she is separated from HPD. *Id.*

57.     HPD's policy on use of force, 600-17, requires officers to limit their use of force and physical contact to only the amount reasonably necessary to protect themselves or others, to effect an arrest, or to bring an incident under control.  (Ex B).  If the officer perceives an immediate or imminent threat of serious bodily injury or death to himself/herself or another, then the officer is not required by policy to use an intermediate weapon first.  *Id.*

### III.    STANDARD OF REVIEW

The moving party is entitled to summary judgment if the pleadings, discovery, disclosure materials on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); FED.R.CIV.P. 56(C). The moving party has the burden of demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tx.,* 950 F.2d 272, 276 (5th Cir. 1992). The burden then shifts to the non-moving party to show with "significant probative evidence" that a genuine issue of material fact exists.  *Hamilton v. Seque Software,* 232 F.3d 473, 477 (5th Cir. 2000) (*quoting Conkling v. Turner,* 18 F.3d 1285, 1295 (5th Cir. 1994)). Facts are considered material if they might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-248 (1986). When considering evidence, all reasonable inferences are to be resolved in favor of the non-moving party.  *Evans v. City of Houston,* 246 F.3d 344, 348 (5th Cir. 2001).

However, the non-movant must show more than "some metaphysical doubt as to material facts."  *Meinecke v. H&R Block of Houston,* 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation or only a scintilla of evidence will not carry this burden.  *Brown v. City of Houston,* 337 F.3d 539, 541 (5th Cir. 2003). Likewise, unsupported allegations, affidavits, or deposition testimony asserting ultimate or conclusory facts and conclusions of law are also not sufficient to defeat a motion for summary judgment.  *Clark v. American's Favorite Chicken,* 110 F.3d 295, 297 (5th Cir. 1997). Where the record, taken as a whole, indicates that no reasonable jury could return a verdict for the non-movant, there is no genuine issue for trial.  *Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1286 (5th Cir. 1990).

13

## IV.    ARGUMENT SUMMARY

Defendants Officer Rosemon and the City of Houston are entitled to summary judgment as a matter of law.  Officer Rosemon, in his individual and official capacity, is entitled to qualified immunity.  Plaintiff cannot rebut Officer Rosemon's immunity assertion with competent and admissible summary judgment evidence.  The City of Houston is likewise entitled to summary judgment because Plaintiff cannot establish that a deprivation of Plaintiff's constitutional rights was inflicted pursuant to an official policy or custom and that that policy or custom was the proximate cause of Plaintiff's injuries.

## V.    ARGUMENT

**A.    Officer Rosemon is entitled to qualified immunity.**

"Qualified immunity promotes the necessary, effective, and efficient performance of governmental duties by shielding from suit all but the plainly incompetent or those who knowingly violate the law." *Bittkis v. The City of El Paso*, supra; *Mangieri v. Clifton* 29 F.3d 1012, 1017 (5th Cir. 1994). Qualified immunity involves a two-prong test to determine whether an official is entitled to a qualified immunity defense.  *Thompson v. Johnson*, 348 Fed.Appx. 919, 922 (5th Cir. 2009)(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  First, the court must determine if the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  *Id.*  Second, if a constitutional right has been violated, the court must ask whether the right was clearly established.  *Id.*  The inquiry into whether the individual officers are entitled to qualified immunity turns on the objective reasonableness of their actions in light of the legal rules clearly established at the time.  *Pearson v. Callahan*, 555 U.S. 223, 243 (2009).  If the conduct did not violate a constitutional right, there is no need to address the second prong of the qualified immunity analysis.  *Id.* at 922.  Once the

14

defendant raises the qualified immunity defense, "the burden shifts to the plaintiff to rebut this defense by establishing the official's allegedly wrong conduct violated clearly established law." *Brumfield v. Hollins*, 551F.3d 322 (5th Cir.2008)(quoting *Bazan ex rel. Bavan v. Hidalgo Cnty.*, 246 F.3d 481 (5th Cir.2001).

The U.S. Supreme Court has held that when resolving the questions of qualified immunity at the summary judgment stage, the district court need not view facts favorable to the plaintiff when the record as a whole cannot lead a rational trier of fact to find for the non-moving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff alleges that Officer Rosemon deprived Releford of rights guaranteed by the Fourth Amendment to the Constitution when Officer Rosemon allegedly used excessive force in shooting Releford.  As the representative of Releford's estate, Plaintiff seeks damages for Releford's pain and suffering between the shooting and the time of his death, and funeral expenses.  Plaintiff alleges that Officer Rosemon's actions deprived Plaintiff of Releford's lifelong care, maintenance, support, services, advice, counsel, household services, and loss of inheritance.  (Doc. 1, ¶¶ 86, 87).  Officer Rosemon did not violate Plaintiff's constitutional rights and his actions were objectively reasonable considering the facts and circumstances he faced.

**1.      Officer Rosemon is entitled to qualified immunity on Plaintiff's excessive force claim.**

In a Fourth Amendment excessive force case, a plaintiff must demonstrate that he has an injury that resulted from the use of force that was clearly excessive to the need and the excessiveness of which was clearly unreasonable. *Poole v. City of Shreveport*, 691 F.3d 624 (5th Cir.2012)(citing *Ontiveros v. City of Rosenberg*, 564 F.3d 379 (5th Cir.2009)).  Second, plaintiff must show that the allegedly violated constitutional rights were clearly established at the time of the incident, and, if so, whether the defendant's conduct was objectively unreasonable in light of

the clearly established law at the time.  *Poole* at 627.  The Supreme Court has held that courts should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first, in light of the circumstances of the case at bar.  *Pearson v. Callahan*, 555 U.S. 223 (2009).

The proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham v. Connor,* 490 U.S. 386, 396 (1989).   Courts must look at the "totality of the circumstances" when assessing the reasonableness of a police officer's use of force.  *Id.*   The reasonableness of an officer's use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight.  *Id.*   The analysis of reasonableness must consider allowances for the fact that police officers are often forced to make split second decisions about the amount of force that is necessary in situations that are tense, uncertain and rapidly evolving.  *Id.*

Based on Plaintiff's Second Amended Complaint, and considering the relevant facts of this case that are undisputed, Defendants believe that it is proper to first consider the issue of whether Officer Rosemon's use of deadly force was objectively unreasonable in  light of clearly established law at the time of the conduct in question.  *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005).    The reasonableness of an officer's use of deadly force is determined by the existence of a credible, serious threat to the physical safety of the officer or those in the vicinity. *Hathaway v. Bazany*, 507 F.3d, at 320.  The Fifth Circuit has further narrowed that test, holding that "[t]he excessive force inquiry is confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting."  *Bazan  v. Hidalgo Cnty.,* 246 F.3d

481 (5th Cir.2001).  As such, "the officers' action leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Court."  *Harris v. Serpas*, 745 F.3d 767 (5th Cir.2014).    Thus, the qualified immunity test in this case depends on whether Officer Rosemon perceived that Releford posed a threat so serious as to justify his use of deadly force, and was that perception reasonable given the totality of the circumstances.

Plaintiff asserts that a reasonable officer in Officer Rosemon's position would understand that the use of deadly force in investigating Releford, an unarmed and mentally ill individual, would violate Releford's clearly established constitutional rights under the Fourth Amendment. Plaintiff alleges that at no time during the events described herein did Officer Rosemon possess justification or excuse to use deadly force against Releford.   Plaintiffs' assertions are not supported by the undisputed evidence in the record.

### (i)     *Officer Rosemon's use of deadly force was objectively reasonable given the facts and circumstances at the time.*

The facts establish that from the outset of  Officer Rosemon's encounter with Releford, Releford refused to cooperate and obey Officer Rosemon's commands.  (Ex. A, p. 98).  Releford advanced towards Officer Rosemon with an angry look on his face, biting his lower lip, and keeping his left hand concealed behind his back.  (Ex. A, p. 107).    Officer Rosemon repeatedly gave Releford commands to stop and to show his hands. (Ex. A, p. 101).   Officer Rosemon believed Releford was concealing a deadly weapon in his left hand that he held behind his back. (Ex. A, p.237).   Officer Rosemon back pedaled between seventy to eighty feet in order to create distance before reaching a ditch. (Ex. A, p.107).   Officer Rosemon pled with Releford to stop. *Id.* Officer Rosemon and Releford were within a few feet of each other as Releford continued advancing towards Officer Rosemon with his left hand still behind his back and an angry look on his face. (Ex. A, p.118).   Officer Rosemon could not move any further without falling into the

ditch as Releford closed in.  *Id.*  At that moment, Officer Rosemon believed that Releford was going to kill him.  (Ex. A. p. 134).  In fear for his life, Officer Rosemon shot Releford. (Ex.A, p. 126).  However, after shooting Releford, the threat posed by Releford did not end.  Releford did not fall to the ground.  (Ex. A, p. 120).  Releford bent over, paused momentarily still keeping his left hand behind his back, and charged towards Officer Rosemon. (Ex. A, p. 134). Officer Rosemon tried to create distance by backpedaling in a different direction but Releford advanced quickly towards him with his left hand behind his back. (Ex. A, p. 134). Officer Rosemon still believed that Releford was holding a weapon behind his back and fearing for his life shot Releford a second time. (Ex.A, pp. 185, 190).   Releford then fell to the ground and only then did Officer Rosemon observe that Releford did not have a weapon.  (Ex. A, p. 139).

The excessive force inquiry is confined to whether the officer or another person was in danger "at the moment of the threat" that resulted in the officer using deadly force.  *Bazan v. Hidalgo Cnty.,* 246 F.3d 481 (5th Cir.2001)(citing *Fraire v. City of Arlington,* 957 F.2d 1268, (5th Cir.1992) ("regardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.").   In both instances that Officer Rosemon shot Releford, Officer Rosemon had a reasonable belief that Releford posed an imminent risk of serious harm to him because he believed that Releford was concealing a weapon behind his back by Releford's refusal to obey his commands to stop and show his hands, because of Releford's hostility, and because he knew that Releford had possibly committed a felony assault.

The facts of *Ontiveros* are similar to this case.  In *Ontiveros*, a police officer encountered Ontiveros inside a small, dimly lit room during the investigation of an assault. After seeing Ontiveros holding an object above his head, the officer repeatedly yelled "let me see your

hands." Instead of complying with the officer's commands and showing his hands, Ontiveros reached inside a boot he was holding.  The officer believed the suspect was obtaining a weapon and shot him.  The suspect did not have a weapon.  The court affirmed summary judgment for the officer based on qualified immunity.

In *Carnaby v. City of Houston*, 636 F.3d 183 (5th  Cir. 2011), the Fifth Circuit affirmed this Court's summary judgment for the police officers based on qualified immunity.  This Court found "[t]he officers were trying to prevent serious injury or death, so their use of force was reasonable, and we need not proceed further in the qualified immunity analysis." *Id*.  In that case, officers ordered Carnaby to exit his vehicle and get on the ground. With the door of his car open, Carnaby leaned toward the floor of the car such that officers could not see Carnaby's hands at that instant. Carnaby began to exit his vehicle and began swinging his hands with one hand grasping an object pointed towards one of the officers.  *Id.*  The officers shot Carnaby. Carnaby was searched when he fell to the ground and did not have a weapon on his person.  *Id.*  Instead a cell phone was found on the ground near Carnaby. *Id.*  The entire scenario unfolded within a minute and a half.  *Id.*  This Court reiterated the legal standard as "[t]he use of deadly force may be proper regardless of an officer's negligence if, at the moment of the shooting, he was trying to prevent serious injury or death." *Id*.

In *Elizondo v. Green*, 671 F.3d 506 (5th Cir.2012), the court affirmed summary judgment for the police officer on qualified immunity.  The court found that when the officer responded to a complaint about Green being suicidal, it was not unreasonable to shoot Green who "ignored repeated instructions to put down the knife he was holding" and "was hostile, armed with knife, in close proximity to the [officer] and moving closer." *Id.*

In *Harris v. Serpas*, 745 F.3d 767 (2014), the appellant called for police assistance fearing that her husband might have taken sleeping pills after locking himself in the bedroom. *Id.* The officers found Mr. Harris lying on the bed with a blanket on top.  *Id.*  The officers gave Mr. Harris verbal commands but he would not respond.  *Id.* The officers removed the blanket and found Mr. Harris with a knife in his right hand.  *Id.* After a brief struggle, the officers fired three bullets that killed Mr. Harris.  *Id.*  Among their contentions, Appellants argued that under the totality of the circumstances, deadly force was unreasonable and that the parties' locations and movements in the room at the time of the shooting was a "hotly contested" material factual issue that precluded summary judgment.  *Id.*   The court disagreed in affirming summary judgment for the officers based on qualified immunity noting that the officers reasonably feared for their safety at the moment of the fatal shooting.  *Id.*

Finally, in a recent Supreme Court case, *City of San Francisco v. Sheehan*, 135 S.Ct.,1765 (2015), the Supreme Court found that the officers' use of deadly force was justified and that the officers were entitled to qualified immunity.  Sheehan, a resident in a mental health facility, threatened officers with a knife despite warnings and pepper spray and "kept coming at the officers until she was 'only a few from an officer.'" *Id.*

> (ii)    ***Officer Rosemon's use of force was objectively reasonably under established law.***

Officer Rosemon acted as a reasonable peace officer would act under similar circumstances.  Officer Rosemon gave clear commands for Releford to stop and show his hands and pointed his weapon at Releford.  (Ex. A, p. 102).  Releford did not stop but pursued Officer Rosemon even as the Officer retreated.  *Id.*  The circumstances and information that Officer Rosemon had at the time that he discharged his firearm supports Officer Rosemon's reasonable fear that Releford was about to attack or kill him with a weapon he was concealing behind his

back.  (Ex. A, pp. 185, 190 ).  It was later discovered that Releford had a pack of cigarettes and was unarmed.

The qualified immunity standard "gives ample room for mistaken judgments" by protecting all but the plainly incompetent or those who knowingly violate the law.  *Bittkis v. The City of El Paso*, supra; *Mangieri v. Clifton* 29 F.3d 1012, 1017 (5th Cir. 1994).   All of the officer's actions that occurred once Releford advanced towards Officer Rosemon with Releford's hand concealed behind his back were predicated upon responding quickly and decisively to what Officer Rosemon perceived to be a serious threat.   That those decisions subsequently become subject to second guessing does not make those actions any less objectively unreasonable.  *Stroik v. Ponseti*, 35 F.3d 155, 158-159 (5th Cir. 1994).   What constitutes "reasonable" actions to someone facing a possible assailant is undoubtedly quite different than to someone analyzing the question at leisure.  *Ontiveros,* 564 F.3d 379.  The reasonableness of an officer's actions must be judged from the perspective of an officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* at 382.    Given the totality of the facts and circumstances known to him at the time, Officer Rosemon's decision to fire his weapon was objectively reasonable, and he is entitled to qualified immunity.

Attached in support of Defendants' motion, are reports/affidavits from Senior Police Officer George Guerrero and Assistant Chief Mattie C. Provost.  (Exs. B and C).  Guerrero is, and has been for several years, an instructor at the Houston Police Academy, teaching courses related to officer safety.   (Ex. B).  Assistant Chief Provost holds several degrees, most notably, bachelor and master degrees in law enforcement.  (Ex. C.).  At the time of this incident, Assistant Chief Provost was the Assistant Chief of Professional Standards Command which included the internal investigations command.  *Id.*

Both Officer Guerrero and Assistant Chief Provost reviewed documents and other materials related to this case.  (Exs. B and C).  Both Officer Guerrero and Chief Provost agree that the actions of Officer Rosemon were reasonable in light of the entire event.  *Id.* Officer Rosemon acted as a reasonable and prudent officer based on the circumstances and information at the time of the incident. *Id.*  Another Texas peace officer facing the same or similar circumstances and with the same available information could have chosen to take the same or similar actions as the actions taken by the officer. *Id.*  In addition, Chief Provost and Officer Guerrero point out that two witnesses, Felicia Perry and Roger Abbs, gave statements that corroborate the critical aspects of Officer Rosemon's account of the incident.  *Id.*

Officer Guerrero points out that Officer Rosemon gave clear commands for Releford to stop and show his hands and pointed his weapon at Releford, Releford did not stop but pursued Officer Rosemon even as the Officer retreated.  (Ex. B).   Both Officer Guerrero and Chief Provost point out that the circumstances and information Officer Rosemon had at the time he discharged his firearm support Officer Rosemon's reasonable fear that Releford was about to attack or kill him with a weapon Releford was concealing behind his back.  (Exs. B and C).

     **(2)**     **There are no genuine issues of material fact.**

A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Rockwell v. Brown,* 664 F.3d 985, 990 (5th Cir.2011).  Self-serving allegations are not the type of significant probative evidence required to defeat summary judgment. *United States v. Lawrence,* 276 F.3d 193 (5th Cir.2001). When the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict.  *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472 (5th Cir.

2002)..  This jurisprudential rule has evolved from cases in which opposing parties had provided the affidavit and the deposition; but it applies equally to situations such as this, when the affidavit contradicts prior sworn testimony by the affiant himself.  *Id.*  See also *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir. 1996) (striking affidavit due to inconsistency with prior testimony); *Copeland v. Wasserstein, Perella & Co.,* 278 F.3d 472 (5th Cir. 2002) (holding that unexplained contradiction in late coming affidavit would not suffice to defeat summary judgment); *Thurman v. Sears, Roebuck & Co*., 952 F.2d 128 (5th Cir. 1992) (holding that inconsistent affidavit could not be basis of overcoming summary judgment); *Albertson v. T.J. Stevenson & Co.,* 749 F.2d 223 (5th Cir. 1984) (holding that summary judgment cannot be defeated with an unexplained contradictory affidavit); and *Kariuki v. Tarango,* 709 F.3d 495, 505 (5th Cir.2013).

Credibility determinations are generally matters for the jury.  However, when opposing parties tell two different stories*,* one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary.  *Scott* at 330*.*  The unsworn declarations executed in February, March, and October 2015, should be disregarded because no rational jury could believe them.  Plaintiff's counsel obtained the unsworn declarations from six witnesses four, five and twelve months after filing suit and more than two and a half years after the incident occurred.  (Exs. J, K, L, M, and N).

All the declarations, except for Ray Abbs, have the same if not identical language:

   i.   Kenny did not have a gun or any other weapons.

   ii.  At no point that night, that I saw or know of, did Kenny have a weapon or appear to have a weapon.  It was clear to me at all times that Kenny Releford was unarmed.

23

      iii.     Nor, the whole time that I saw him, did Kenny pose or appear to pose a threat to the safety of anyone.

      iv.     At no point that night that I saw or that I know of, did Kenny actively resist arrest, nor did he attempt to evade arrest by escape."  Other than not lying down when Officer Rosemon told him to, Kenny obeyed all of the officer's commands.

(Exs. J-1, K-1, L-1, M-1, N-1, O-1, and P-1).

All the declarants testified that they spoke with Plaintiff's counsel for the first time contemporaneous to signing their unsworn declarations.  Yet Plaintiff's Original Complaint filed on October 2014, is replete with references to what witnesses and neighbors said to Officer Rosemon during the incident. (Doc. 1, ¶¶ 22, 29).  The unsworn declarations are self-serving conclusory allegations that do not constitute reliable summary judgment evidence.

For example, Perry gave an audio statement to Homicide investigators within hours of the incident on October 11, 2012.  (Exs. F, L-2). Subsequently, on January 7, 2013, Perry gave a sworn statement to IAD investigators.  (Exs. I, L-3).  Perry's statements to Homicide and IAD are consistent with Officer Rosemon's account of the incident which were both taken on the night of the incident. In both her audio statement to Homicide and sworn statement to IAD, Perry confirmed that Releford was advancing towards Officer Rosemon, Officer Rosemon was giving Releford commands to stop, and that Releford had his hand behind his back.  (Exs. F, I, L-2, L-3).

   Perry stated to the Homicide investigator on the night of the incident that she could hear the officer giving commands like "don't come forward, be still, don't move." (Exs. F, L-2).  She further stated that Releford's hand was behind his back when Officer Rosemon shot him.  *Id.*   In her IAD statement three months later, Perry confirmed again that she could clearly see that Kenny had a hand behind his back. (Ex. I, L-3).  She saw the officer walking backwards with Kenny approaching him. *Id.*   Significantly, Perry saw the entirety of the second shot and never

observed Releford on the ground after the first shot. *Id.*   In fact, she clearly stated in her statements to the Homicide and IAD investigators that she only saw the second shot and Releford was advancing towards Officer Rosemon with his hand behind the back.  (Exs. F, I, L-2, L-3).

On February 22, 2015, Perry executed an unsworn declaration.   (Ex. L).   In her declaration, under penalty of perjury, Perry stated that "[Releford] was holding his hands slightly away from his body."   *Id.* Perry described seeing Releford shot the first time, falling down, getting back up, and then being shot a second time by Officer Rosemon.  *Id.*  In her deposition on October 30, 2015, after her Homicide and IAD statements were provided to her, Perry recanted what she stated in her unsworn declaration and testified that she heard the first shot but saw the second shot,  she only saw Releford's right hand but did not see his left hand, and that Releford was walking towards Officer Rosemon.  (Ex. L-1).

Perry's unsworn declaration is a sham affidavit purporting to create a genuine issue of material fact.  Like the other declarations, Perry's unsworn declaration should be struck and not considered for summary judgment purposes since it contains material changes to her prior sworn testimony with no explanation.

Besides Perry, Abbs was the other witness that gave statements to the Homicide and IAD investigators on the night of the incident.  Abbs first had an informal conversation with Officer Evans at the scene.  Officer Evans wrote down what Abbs told him.  (Exs. E, E-1).  According to Evans, Abbs stated that Releford kept coming towards Officer Rosemon as Officer Rosemon kept telling Releford to get down.  *Id.*  Abbs also stated that after being shot, he saw Releford coming out of the ditch coming at Officer Rosemon in an aggressive manner and that Officer Rosemon had to back up towards Abbs when he shot Releford again.  *Id.*  That same night, Abbs

25

provided a video statement to the Homicide investigators stating that he heard Officer Rosemon giving Releford commands to get down and stop but Releford continued his advance. (Exs. F, P). Abbs also stated that he saw Releford coming out of the ditch aggressively towards Officer Rosemon. *Id.*

On January 5, 2013, Abbs provided a sworn statement to the IAD investigator, Sgt. Seagler. (Exs.I, P-1). Once again, Abbs stated that Releford advanced towards Officer Rosemon despite Officer Rosemon giving Releford commands to get down and stop. *Id.* Abbs stated that after being shot, Releford stood there and then started coming at Officer Rosemon. *Id.* Only Perry's and Abbs' statements to the Homicide and IAD investigators taken contemporaneous to the incident should be considered for summary judgment purposes.

The wording in the unsworn declarations are similar, if not identical. Yet each declarant testified that those were his or her exact words that each witness told Plaintiff's counsel. All the declarants testified they witnessed the shooting but Sergeant Murdock testified that he canvassed the neighborhood, knocked on doors, spoke to people in their yards, and if they were in bed at the time of the shooting, they could not be eye witnesses. (Ex. D). Furthermore, Sergeant Murdock testified that Perry was the only witness at the scene that was located and so he sent her to HPD to give a statement. *Id.*

All the declarants gave conflicting testimony in their depositions. Significantly, they all stated in their unsworn declarations and in their depositions that Releford fell to ground after the first shot and that Officer Rosemon and Releford were ten feet apart. However, in the Homicide and IAD statements taken at the time, neither Perry, Abbs, nor Officer Rosemon ever stated that Releford fell to the ground after the first shot. (Exs. F, I, A-3, L-2, L-3, P, P-1). More importantly, whether Releford fell to ground after the first shot or was ten feet from Officer

26

Rosemon, does not factor into the qualified immunity analysis of whether Officer Rosemon felt an imminent threat to his safety at the moment of thethreat. Simply put, the unsworn declarations are an attempt by Plaintiff to manufacture a fact issue in order to defeat summary judgment.

**B.      Releford cannot establish that the City of Houston is liable under 42 U.S.C. § 1983.**

When the claim is one of excessive force, the key to recovering against a municipality under § 1983 is demonstrating that a deprivation of a constitutional right was inflicted pursuant to an official policy or custom. *Holland v. City of Houston,* 41 F.Supp.2d 678, 697 (S.D. Tex. Jan. 7, 1999). If a plaintiff alleges or attempts to prove that a custom for which a municipality is liable is based on the actions of the municipality's employees, the plaintiff must show that those actions occurred for so long or so frequently that the course of conduct warrants attributing knowledge to the governing body that the conduct is an expected, accepted practice of the municipality's employees. *Holland,* 41 F.Supp.2d at 698 (quoting *Webster v. City of Houston,* 735 F.2d 838-842 (5th Cir. 1984)). Random acts or isolated incidents are not sufficient to show the existence of a custom or policy. *Id.* A plaintiff must show that a pattern of similar incidents in which citizens were injured or endangered by intentional or negligent police misconduct and/or that serious incompetence or misbehavior was general or widespread throughout the police force. *Id.* Finally, a plaintiff must show that there exists a direct causal link between a municipal or custom and the alleged constitutional deprivation. *Id.* Specifically, the government policy or custom was the proximate cause of the injuries sustained. *Id.*

While isolated unconstitutional actions by municipal employees will almost never trigger Liability, Plaintiff also seeks to impose liability on the City based on the "single officer / single incident" exception. *Piotrowski v. City of Houston,* 237 F.3d 567, 578 (5th Cir. 2001). The

Plaintiff must establish that the need for more or different training of the officer was so obvious that the failure to train amounted to deliberate indifference and must prove that the "highly predictable" consequence of a failure to train or supervise would result in the specific injury suffered and was the moving force behind the constitutional violation. *Brown v. Bryan County,* 219 F.3d 450, 457 (5th Cir. 2000). In *Brown,* there was a complete lack of training of a deputy who had a history of problems. The Fifth Circuit has repeatedly emphasized that the **complete lack of training** in *Brown* was significant, noting that "[i]t is not enough to say that more or different training or supervision would have prevented the result . . . ." *Estate of Troy Davis v. City of North Richland Hills,* 406 F.3d 375 (5th Cir.2005). As explained in detail above, Plaintiff cannot establish a genuine issue of material fact of the extreme circumstances required for single officer liability. The undisputed evidence is that HPD adequately and appropriately trains its officers and that Officer Rosemon's record was not such that it would put HPD on notice that more or different training or supervision was required. The standard is simply not one of negligence and is insufficient to establish deliberate indifference.

1.      **No Failure to supervise/train.**

For a municipality to be liable for failure to supervise under Section 1983, a plaintiff has to present evidence that it was obvious that "the highly predictable consequence" of not supervising its officers would lead to the violations of constitutional rights of citizens. *Peterson v. City of Fort Worth, Texas,* 588 F.3d  838,850 (5th Cir.2009). Plaintiffs cannot point to any admissible summary judgment evidence that a highly predictable consequence of not supervising its officers, like Officer Rosemon, would lead to officers shooting citizens similar to that which occurred in this case.

Failure to train.  To establish a claim of failure to train under Section 1983, a plaintiff must show that the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011)(citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)).  Deliberate indifference can only be established by proof that a municipal actor disregarded a known or obvious consequence of his action.  *Connick,* 131 S.Ct. at 1360.  City policymakers may be deemed deliberately indifferent if the policymakers choose to retain a training program that they are on actual or constructive notice that a particular omission in that program causes city employees to violate citizens' constitutional rights.  *Id.* "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.*  "There is no *de facto* final policymaking authority."  *Peterson*, 588 F.3d at 847-48 (citing *Jett v. Dallas I.S.D.*, 491 U.S. 701, 737 (1989)).  Chief  Charles McClelland is the only final policymaking authority in the Houston Police Department.

In the context of a failure to train or supervise allegation there usually requires a pattern of similar incidents in which citizens were injured.  *Estate of Davis,* 406 F.3d at 383.  A single incident is rarely sufficient evidence for liability.  *Id.*  "Prior incidents cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."  *Id.*

Plaintiffs allege that Houston both inadequately trained and/or failed to train its officers in response to repeated violations of HPD policies and procedures.  As an initial matter, Plaintiff cannot point to any admissible summary judgment evidence to support this conclusory, unsubstantiated claim.  Moreover, the undisputed evidence in the record establishes that HPD's training regimen meets if not exceeds what is mandated by the State licensing board, TCOLE.

29

Use of force is repeatedly addressed in both the cadet academy class and as a part of the annual in-service training which is twice what is required by TCOLE.  (Ex. B).   While in the academy, cadets are taught courses, including courses on use of force which are mandated by the TCOLE.  *Id.*  Officers are also placed in various scenarios on  use of force.  (Ex. A, p. 167).  Officer Guerrero detailed the  in service classes taken by Officer Rosemon in his report which demonstrate that officers continue to receive training in use of force long after they graduate from the academy.  (Ex. B).   Officers, including Officer Rosemon, are also provided ongoing training and updates on the law.  *Id.*    There is no evidence in the record that officers, like Officer Rosemon, did not receive adequate training on use of force.

Plaintiff has made no showing that Officer Rosemon misunderstood the conditions under which use of deadly force was permissible, or that such a misunderstanding caused Officer Rosemon to improperly use deadly force in this instance. (Ex. A, pp. 163, 164).   Officer Rosemon received training on the use  of force at the Academy as well as in ongoing courses such as his decision-making course.  *Id.*

Plaintiff alleges that Houston failed to properly train its officers in dealing with people with mental illness.  Again Plaintiff cannot point to any admissible summary judgment evidence to support this conclusory unsubstantiated claim that Officer Rosemon was on notice that Releford suffered from mental illness at the time he was dispatched to scene or thereafter.  (Ex. A).  Officer Rosemon testified about the MDT message as it appeared on the MDT monitor which indicated that there was no mental issues with respect to the suspect.  (Ex. A, pp. 72,73).  Officer Rosemon further testified that when he arrived at the scene and spoke to the complainant, Abbs did not state that Releford suffered from mental issues.  (Ex. A, p.70).  Abbs' video statement to the Homicide Division and his IAD statement does not state that he told Officer

Rosemon that Releford had mental issues.  (Ex. P, P-1).   Finally, Officer Rosemon testified that during the altercation with Releford, he did not hear anything about Releford's mental issues. (Ex. A. p. 133).   Assuming arguendo that Officer Rosemon had notice that Releford suffered from mental illness, which Defendants deny, Officer Rosemon was not pre-empted from using deadly force for his safety and that of others from a threat of serious injury or death.  (Ex. Q). Once again, Releford's mental health does not factor into a qualified immunity analysis.   As previously stated, the Supreme Court granted qualified immunity to police officers who shot a known mentally ill person during an altercation that threatened the officers' safety.  *City of San Francisco v. Sheehan*, 135 S.Ct.1765 (2015).

Moreover, the undisputed evidence in the record establishes that HPD's training regimen on de-escalation/crisis intervention training ("CIT") exceeds what is mandated by the State's licensing board for peace officers.  (Ex. Q).  Defendants' expert, Officer Frank Webb, detailed in his report that HPD's CIT program is considered the model program in the State and nationally. *Id.* While the State mandates only twenty-four (24) hours of CIT for all new recruits, HPD exceeds this mandate and provides cadets with a forty (40) hour CIT class.  *Id.*   This forty (40) hour CIT class started with cadet class #191 in March 2007 and is considered advanced CIT. *Id.* In essence, since 2007, HPD has made it a policy to train all cadets at the higher forty (40)-hour level well beyond State requirements. *Id.* After graduating from the Academy, a classified employee is then required to take an annual eight (8) hour Advanced CIT class once they have successfully completed the 40-hour Mental Health Peace Officer/CIT class. *Id.*

In his review of Officer Rosemon's training records, Webb stated that on October 11, 2012, Officer Rosemon was within the Department's requirements for CIT training applicable to him at that time.  *Id.*   Webb further stated that he was not aware of any CIT standard that would

31

restrict an officer's ability to take reasonable actions to protect him/herself or another from the risk of serious bodily injury or death posed by the actions of person simply because that person is suffering from mental illness.  *Id.*  Even a CIT trained officer may not readily be able to determine if a person's actions are due to mental illness, the influence of drugs, malicious intent or some other motivation or cause.  *Id.*  The actions of the person, regardless of whether or not they are suffering from mental illness, may require the officer to take immediate and appropriate actions to provide for the safety of the officer and possibly third parties from a threat of serious injury or death.  Such actions may include the use of any force up to and including the use of deadly force.  *Id.*

Plaintiff cannot put forth any evidence that the policymaker for HPD, the Chief of Police, chose to retain a training program that he is on actual or constructive notice that a particular omission in that program causes his officers to violate citizens' constitutional rights similar to what happened in this case.  Plaintiff alleges six (6) cases of officer involved shootings, three (3) which involved mentally ill persons, as evidence of a problem in HPD's training program. Plaintiff and his expert cannot show how these cases are similar to the present case to put the Chief of Police on notice that his CIT program was deficient.

2.       **No Failure to investigate/discipline.**

Plaintiff alleges that because IAD determined Officer Rosemon's shooting of Releford to be justified, like other officer involved shootings between 2009 and 2012, it was a preexisting disposition and policy of Houston to not investigate and discipline officers for use of force.  A bare list of prior incidents cannot show a pattern sufficient to survive summary judgment. *Oporto v. City of El Paso*, 2012 WL 2191697, *5 (W.D.Tex. June 14, 2012).  (finding that the plaintiffs' evidence of 32 alleged incidents of excessive deadly force in fifteen years and 104

excessive force complaints in one year did not raise a triable issue of fact on their Fourth

Amendment excessive force claim).

> The Fifth Circuit requires more than a list to ensure the fact finder has the necessary context to glean a pattern. *Peterson City of Forth Worth,* 588 F.3d 838, 851 (5th Cir. 2009). For example, the number of incidents is only relevant in context with the "department's size or the number of its arrests." *See id.* at 851. Likewise, the incidents must be sufficiently similar to warrant an inference of a pattern. *See Snow v. City of El Paso,* F.Supp.2d 826, 833 (W.D. Tex. 2006). *Id.*

Plaintiff argues that 102 officer involved shootings in a span of four years, 2009 to 2012,

determined to be justified, points to a pattern of allowing officers to use excessive force with

impunity through inadequate investigation or discipline. First, this is a use of deadly force case,

and so past investigations regarding the use of excessive force generally are not "sufficiently

similar" to provide evidence of a pattern. And even if the plaintiffs focus their claims on the

outcome of deadly force investigations, this exact argument was rejected by Judge Rosenthal in a

recent opinion involving the City in *Young v. Green,* 2013 WL 775388 (S.D. Tex. Feb. 28,

2013). In *Young,* the plaintiffs alleged that Officer Green used excessive force against them and

committed other Fourth Amendment violations. Plaintiffs attempted to establish a custom of

inadequate investigation or discipline based on the results of investigations of shooting incidents

by HPD officers. Judge Rosenthal found that the Plaintiffs had not raised a genuine issue of

material fact:

> The plaintiffs also point to the fact that no recent HPD investigation into a shooting by an HPD officer has concluded that the shooting was unjustified. Between March 2005 and March 2010, about 170 individuals were shot by HPD officers. Of these shootings, all but two were determined to have been justified. The remaining two were classified as "accidental" or "information." These numbers do not themselves show that the investigations were inadequate or that the conclusions they reached were incorrect.

*Id.* at *20.

33

Furthermore, the Fifth Circuit has held that a small number of incidents in one of the nation's largest cities and police forces cannot support a pattern of illegality to support a failure to train claim.  See *Pineda v. City of Houston,* 291 F.3d 325, 329 (5th Cir. 2002)(holding that eleven incidents each offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces.). Finally, Plaintiff cannot show that this unsubstantiated failure to train was the proximate cause of Releford's damages.  For this reason, Plaintiff's failure to train claim falls short.

Other claims.  Plaintiffs also allege that Houston failed to effectively discipline or train its officers in response to repeated violations of HPD policies; failed to discharge officers who have shown a pattern or practice of excessive force; failed to identify officers likely to commit future violations of use of force policy; promoted officers accused of misconduct at a higher rate than officers not so accused; and dispatched inexperienced officers alone.  (Doc. 13).  Plaintiff's raft of alleged failures do not amount to anything more than conclusory allegations insufficient to withstand a motion for summary judgment.  Plaintiff cannot point to a municipal custom or policy which was the proximate cause of Plaintiffs' injuries.

**C.      Plaintiff is not entitled to the damages he seeks.**

Plaintiff does not have a valid claim for damages under §1983 against Defendants.  The Court previously dismissed all of Plaintiff's state claims when it granted Defendants' Partial 12(b)(6) Partial Motion to Dismiss. (Doc. 14).  Plaintiff's sole claim in this case is the Fourth Amendment claim and as such Plaintiff's claims under Texas Wrongful Death/Survival Statute, Tex. Civ.Prac. & Rem. Code §71.021 should be dismissed.

**1.      Plaintiff's state law claims are barred by governmental immunity.**

Governmental immunity protects municipalities from lawsuits for money damages unless

such immunity is waived.  *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 655 (Tex. 2008).   Courts interpret waivers of immunity narrowly because the intent to waive immunity must be clear and unambiguous.  *Id.*; Tex. Gov't Code § 311.034 (West 2013). The party suing a governmental entity must plead and prove consent to suit under a clear and unambiguous constitutional or statutory waiver of that immunity. *Tex. Nat. Res. Cons. Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002).

The Texas Tort Claims Act ("TTCA"), codified in chapter 101 of the Texas Civil Practice & Remedies Code, governs waiver of immunity for tort suits against governmental units.  *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 378 (Tex. 2006).  The three general areas in which governmental immunity is waived for torts are: (1) injury caused by an employee's use of a motor-driven vehicle; (2) injury caused by a condition or use of tangible personal property; or (3) injury caused by a condition or use of real property.  *See* Tex. Civ. Prac. & Rem. Code § 101.021 (West 2012); *City of Houston v. Rushing*, 7 S.W.3d 909, 914 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).  Significantly, the TTCA expressly does not waive immunity for intentional torts.  Tex. Civ. Prac. & Rem. Code § 101.057 (West 2012).  *See also City of Watauga v. Gordon,* 434 S.W.3d 586 (Tex. 2014).  Also excluded from the waiver of immunity under the TTCA are allegations against a governmental unit arising out of the same conduct that formed the basis of the intentional tort claims against its employee.  *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001).

In their Second Amended Complaint, Plaintiff alleges that Officer Rosemon intentionally shot Releford.  (Doc. 54, ¶ ¶ 27,85).   The Texas Supreme Court in *City of Watauga v. Gordon,* 434 S.W.3d 586 (2014), held that a plaintiff's claim that handcuffs were negligently used by a police officer, causing the plaintiff injury, did not state a claim under the TTCA for which

35

immunity had been waived.  The Court held that "when an arrest, lawful in its inception, escalates into excessive-force allegations, the claim is for battery alone."  *Id.* at 593.  The Court in *Watauga* essentially rejected the concept that allegations of unintended injury during an arrest can state a negligence claim.

> The court of appeals in this case is not the first Texas court to conclude that allegations of unintended injury during an arrest state a negligence claim.  *See, e.g., City of Lubbock v. Nunez,* 279 S.W.3d 739, 742-43 (Tex. App.– Amarillo 2007, pet. granted & dism'd by agr.) (concluding that the death of an uncooperative suspect caused by a police officer's repeated use of a taser was unintentional and consequently the result of negligence).  But again, we agree with [*District of Columbia v.*] *Chinn,* [839 A.2d 701, 707 (D.C. 2003)] that such a conclusion is "doctrinally unsound."  *Chinn,* 839 A.2d at 707.  The actions of a police officer in making an arrest necessarily involve a battery, although the conduct may not be actionable because of privilege . . . But a police officer's mistaken or accidental use of more force than reasonably necessary to make an arrest still "arises out of" the battery claim. [*City of San Antonio v.*] *Dunn,* 796 S.W.2d 258, at 261 [(Tex. App.– San Antonio 1990, writ denied)].  "As the saying goes, *there is no such thing as a negligent battery*, since battery is defined to require an intentional touching without consent, not a negligent one." 1 THE LAW OF TORTS § 31 at 77.

*City of Watauga v. Gordon,* 434 S.W.3d 586, 593-594 (Tex. 2014).

As explained in *Watauga,* Plaintiff's claim that Officer Rosemon acted intentionally by when he fired his gun does not state a negligence claim for which immunity has been waived under the TTCA.  Thus Plaintiff's claims as a wrongful death beneficiary and representative of the Estate of Releford under the Texas Wrongful Death/Survival Statute, Tex. Civ.Prac. & Rem. Code §71.021 should be dismissed.

## VI.   CONCLUSION

For the reasons state above, there is no genuine issue as to any material fact in any of the claims brought by the Plaintiff.  Officer Rosemon and the City have established their qualified immunity defense.  Plaintiff cannot present evidence to this Court that supports his claims and

defeat the Defendants' assertion of qualified immunity.   As such, Defendants motion for summary judgment should be granted on all claims.

WHEREFORE, Defendants respectfully request this Court to grant their motion for summary judgment, dismiss Plaintiff's claims and grant them any additional relief the Court deems appropriate.

Respectfully submitted,
DONNA L. EDMUNDSON
City Attorney

DON H. FLEMING
Chief Labor, Employment and Civil Rights

By:      /s/ *Nirja S. Aiyer*
Nirja S. Aiyer
Sr. Assistant City Attorney
State Bar No.:  00795048
Federal ID No.: 19661
P.O. Box 368
Houston, TX 77001-0368
Nirja.Aiyer@houstontx.gov
Tel: (832) 393-6283
Fax: (832) 393-6259
Attorney In Charge

Suzanne R. Chauvin
Senior Assistant City Attorney
Southern District Bar No. 14512
Texas State Bar No. 04160600
P.O. Box 368
Houston, TX 77001-368
900 Bagby, 3rd Floor
Houston, TX 77002
Tel: (832) 393-6219
Fax: (832) 393-6259
Suzanne.Chauvin@houstontx.gov
ATTORNEYS FOR DEFENDANTS
CITY OF HOUSTON AND JASON
OFFICER ROSEMON

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Defendants' Motion for Summary Judgment was served in accordance with the Federal Rules of Civil Procedure on this the 21st day of December, 2015.

Walt Cubberly                                          *Via E-Filing*
Stradley, Davis & Reynal
917 Franklin, Sixth Floor
Houston, Texas 77002


Joseph C. Melugin                                      *Via E-Filing*
THE FAUBUS FIRM
1001 Texas Ave., 11th Floor
Houston, Texas 77002



/s / *Nirja S. Aiyer*

38