## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **AUDRY L. RELEFORD JR.**, *et al*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-2810** |
| | § | |
| **CITY OF HOUSTON**, *et al*, | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court are the motion for summary judgment and the motion to exclude expert testimony filed by Defendants the City of Houston and Jason Rosemon. (Doc. Nos. 74 & 76.) After carefully considering the motions, responses, replies, the record, and the applicable law, the Court finds that the motions should be denied.

### I.   BACKGROUND

This case arises under 42 U.S.C. § 1983 and concerns the fatal shooting of Kenny Releford by Officer Jason Rosemon of the Houston Police Department. Plaintiff Audry Releford has sued Officer Rosemon and the City of Houston as Kenny's father and as the representative of Kenny's estate. Mr. Releford alleges that Officer Rosemon violated Kenny's constitutional rights by using excessive force against him. (Doc. No. 58 ¶ 42.) Mr. Releford further alleges that the City of Houston violated Kenny's constitutional rights by failing to properly supervise, train, discipline, or investigate its officers in the use of force and by adopting a custom or policy that caused Kenny's death in violation of his constitutional rights. (*Id.*)

Few facts in this case are undisputed. However, the parties do agree on the following narrative. On October 11, 2012, just after midnight, Officer Rosemon reported to Kenny's

neighborhood after receiving a suspicious person call from dispatch. (Doc. No. 74 at 9; Doc. No. 87 at 12–13.) When he arrived, he talked with Roger Abbs, the person who had called 911. (Doc. No. 74 at 9; Doc. No. 87 at 12–13.) Officer Rosemon then drove to Kenny's house and used the loud speaker in his patrol vehicle to announce, "I need to speak with Kenny. Kenny, come on out." (Doc. No. 74 at 9–10; Doc. No. 87 at 14.) Kenny was either already on the porch or soon came out of his house. (Doc. No. 74 at 10; Doc. No. 87 at 15.) He then began approaching Officer Rosemon. (Doc. No. 74 at 10; Doc. No. 87 at 15.)

At 12:09:14, Officer Rosemon radioed "shots fired," meaning that he had shot Kenny. (Doc. No. 74 at 11; Doc. No. 87 at 18.) At 12:10:04, Officer Rosemon radioed for the Houston Fire Department to come to the scene. (Doc. No. 74 at 11; Doc. No. 87 at 19.) At 12:10:10, Officer Rosemon radioed, "He's standing back up—keep coming." (Doc. No. 74 at 12; Doc. No. 87 at 21; Doc. No. 83, App'x P at 000211-RELEFORD.) At 12:10:24, Officer Rosemon radioed, "51, Shots fired again—he down." (Doc. No. 74 at 12; Doc. No. 87 at 20; Doc. No. 83, App'x P at 000211-RELEFORD.) At 1:48 AM, Kenny was pronounced dead at the hospital. (Doc. No. 87 at 21.) The parties dispute the facts leading up to the first shot and what happened between the two shots.

One key factual dispute permeates Mr. Releford's excessive-force claim. Before Officer Rosemon shot Kenny, could he see that Kenny was unarmed? It is undisputed that Kenny was, in fact, unarmed. (Doc. No. 74 at 28; Doc. No. 87 at 15.) However, Officer Rosemon says that, during their entire encounter leading up to the shooting, he could not see Kenny's left hand because Kenny was holding it behind his back. (Doc. No. 74, Ex. A at 95:21–25, 100:13, 101:10–11, 107:21–22, 120:5–6, 122:6–8, 134:4–5; 135:7–9.) According to other witnesses, Kenny's hands were visible. (Doc. No. 74, Ex. J-1 at 72:13 to 75:2, 135:25 to 136:22; Doc. No. 74, Ex. K-

1 at 92:17, 209:6–12; Doc. No. 74, Ex. M-1 at 82:6–19, 153:5–15; Doc. No. 74, Ex. N-1 at 56:22 to 57:17.) Another contested issue is whether Officer Rosemon knew that Kenny suffered from mental health problems. Officer Rosemon says he had no knowledge of any mental health issues, (Doc. No. 74, Ex. A at 73:6–13, 133:16–18), while Mr. Abbs says he told 911 and Officer Rosemon that Kenny had mental health problems, (Doc. No. 83, App'x K, Ex. 30; Doc. No. 83, App'x J, Ex. 27 ¶ 13).

## II.   STANDARD OF REVIEW

A motion for summary judgment should be granted if no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those whose resolution "might affect the outcome of the suit under the governing law." *Willis v. Roche Biomedical Labs.*, 61 F.3d 313, 315 (5th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322–23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S.*

*Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence that supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Nor will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the nonmoving party, and it cannot make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). However, "when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony," an explanation of that conflict is required. *Copeland v. Wasserstein, Perella & Co.*, 278 F.3d 472, 482 (5th Cir. 2002). Without one, the conflict between affidavit and deposition does not preclude summary judgment. *Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1984) ("[T]he nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony.").

4

### III.   LEGAL FRAMEWORK

#### A.  Qualified Immunity

Defendants contend that Officer Rosemon is entitled to qualified immunity. Analysis of a qualified immunity defense has two parts. The first part addresses whether a plaintiff was subjected to a constitutional deprivation—here, to the use of excessive force. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009). The second part addresses whether the constitutional deprivation was objectively unreasonable under prevailing law at the time of the incident. *See id.* If a reasonable police officer in the specific circumstances faced by the defendant would not have known that his conduct was unlawful under clearly established law, qualified immunity protects the defendant from liability. *See Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).

To demonstrate the first part, a constitutional deprivation of excessive force, "a plaintiff bears the burden of showing '(1) an injury (2) which resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable.'" *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). The Supreme Court has established three guideposts for determining whether a particular use of force was reasonable: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The objective reasonableness of a particular use of force is highly fact-and context-specific. *See Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005). It must be judged in light of the information available to the officer at the time. *See Graham*, 490 U.S. at 397. Some

amount of deference is afforded to the officer's discretion, as his or her service in real time, in unknown environs, often requires split-second decisions based on evolving information. *See Brown v. Glossip*, 878 F.2d 871, 873 (5th Cir.1989); *see also Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). "The 'reasonableness' of a particular use of force" cannot be judged "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

At the same time, the standard is an objective one—whether the use of force was "'objectively reasonable' in light of the facts and circumstances confronting [the officer]" at the time force was employed. *See Graham*, 490 U.S. at 397. In such an analysis, the subjective intent of the defendant in question plays no meaningful role. *See Poole v. City of Shreveport*, 691 F.3d 624, 630 (5th Cir. 2012).

The second part of the qualified immunity analysis focuses on whether the alleged constitutional deprivation was objectively unreasonable under clearly established law. This prong is comprised of two separate, but related, inquiries: "whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the defendant's conduct was *objectively reasonable* in the light of that then clearly established law." *Tolan v. Cotton*, 713 F.3d 299, 305 (5th Cir. 2013) (quotation marks and citation omitted).

A right is clearly established when "every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quoting *Anderson*, 483 U.S. at 640). "Existing precedent must place the statutory or constitutional question beyond debate." *Tolan*, 713 at 306 (quotation marks and citation omitted). Requiring an alleged constitutional deprivation to violate clearly established law before relief may be pursued "balances the vindication of constitutional or statutory rights and the effective performance of governmental duties by ensuring officials can 'reasonably . . . anticipate when their conduct may

6

give rise to liability for damages.'" *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

### B.  Municipal Liability

Municipalities are considered "persons" who may be sued directly under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents." *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999) (citing *Monell*, 436 U.S. at 694). A local government may be sued under § 1983 "'if it is alleged to have caused a constitutional tort through a policy statement, ordinance, regulations, or decision officially adopted and promulgated by that body's officers.'" *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988) (plurality opinion)). Municipalities may also be liable for constitutional deprivations that occur as a result of "a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir.) *on reh'g*, 739 F.2d 993 (5th Cir. 1984). "[A] facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). "To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

### C.  Admissibility of Expert Testimony

Expert testimony must be relevant and reliable to be admissible. Rule 702 of the Federal Rules of Civil Procedure provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

This current version of Rule 702 includes the amendments in 2000 in response to the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Whether to consider a particular factor listed in Rule 702, *Daubert*, or *Kumho* is discretionary, except that "the existence of sufficient facts and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

## IV.   ANALYSIS

### A.  Qualified Immunity Defense

The materiality of whether Officer Rosemon could see that Kenny was unarmed is obvious from the record, the relevant case law, and the parties' arguments. Defendants' motion repeatedly states that Officer Rosemon could not see Kenny's left hand and thought that he was armed. These facts form the basis for Defendants' qualified immunity defense: that Officer Rosemon, at the time he shot Kenny, reasonably believed that Kenny "posed an imminent risk of serious harm." (Doc. No. 76 at 25.) The cases on which Defendants rely involve either suspects who were clearly armed or officers who reasonably thought that the suspect was reaching for a weapon. *See City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1770 (2014) (the suspect had a knife); *Harris v. Serpas*, 745 F.3d 767, 770 (5th Cir. 2014) (same); *Elizondo v. Green*, 671 F.3d

506, 508 (5th Cir. 2012) (same); *Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011) (the officer shot the suspect after seeing the suspect "lean[] toward the floor of the car" and then, "while exiting, swing his hands—one of which was grasping an object—around toward another officer); *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 381 (5th Cir. 2009) (the officer shot the suspect after seeing the suspect reach into a boot he was holding at chest level for what the officer believed was a weapon).

By contrast, Mr. Releford's response repeatedly states that Officer Rosemon could see that Kenny was unarmed. Mr. Releford uses that fact to distinguish the cases cited by Defendants. In addition, Mr. Releford's choice of case law illustrates the importance of this question. Mr. Releford relies on *Tennessee v. Garner* for the proposition that use of deadly force is unjustified when "the suspect poses no immediate threat to the officer and no threat to others." 471 U.S. 1, 11 (1985). He also discusses *Sanchez v. Fraley*, a case where the court found a genuine issue of material fact precluded summary judgment when the officer testified in his deposition that the suspect "was digging in his waistband and pointing his hands under his shirt as though aiming a weapon" but another witness testified at her deposition that she saw the suspect's hands at his sides. 376 Fed. App'x 449 (5th Cir. 2010). The sole mention of *Garner* in Defendants' reply is to quote its holding that use of deadly force is not excessive when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11. Defendants distinguish *Sanchez* in part by relying on the "undisputed action" of Releford concealing one hand behind his back. (Doc. No. 15.) Moreover, never do Defendants make the alternative argument that, even if Kenny's hands were visible, Officer Rosemon remains entitled to qualified immunity.

With materiality established, the Court turns to whether the factual dispute is genuine.

9

Defendants argue that the six "unsworn declarations executed in February, March, and October 2015, should be disregarded because no rational jury could believe them." (Doc. No. 74 at 30.) As an initial matter, these unsworn declarations are admissible under 28 U.S.C. § 1746 because they are made under penalty of perjury. In any event, the Court is unpersuaded by Defendants' argument for three reasons. First, even if the Court struck the declarations, that would still leave in the record the deposition testimony later given by five of the six declarants. This deposition testimony creates a genuine issue with respect to the material fact of whether Officer Rosemon could see that Kenny was unarmed. For example, Creola Scott testified that Kenny left his house with his hands up. (Doc. No. 74, Ex. N-1 at 56:22 to 57:17.) That contradicts Officer Rosemon's deposition testimony that Kenny's left hand was always hidden.

    Second, Defendants' detailed argument that the witnesses' declarations and deposition testimony are contradictory (Doc. No. 74 at 30–34; Doc. No. 91 at 17–18), never identifies any conflict between the declaration and deposition testimony of Ms. Scott.[1] Ms. Scott's version of events alone creates a genuine dispute. While Officer Rosemon says that Kenny's left hand was always behind his back, Ms. Scott's declaration states that when Kenny came outside, he "had both his arms and hands away from his body and in plain sight. He had nothing in his hands except for maybe a cigarette. It was clear to me that Kenny was unarmed, that he didn't have a weapon of any kind of his person." (Doc. No. 74, Ex. N ¶ 10.) Her declaration further states, "At no point that night, that I saw or know of, did Kenny have a weapon or appear to have a weapon; it was clear to me, at all times, that Kenny Releford was unarmed." (*Id.* ¶ 19.) At her deposition, Ms. Scott testified that she saw Kenny come out of his house with his hands up, almost to his head, with his palms facing outward. (Doc. No. 74, Ex. N-1 at 56:22 to 57:17.) As she continued

---

[1] Defendant's only specific complaint about Ms. Scott's declaration is that it conflicts with the deposition testimony of another witness, Felicia Perry. (Doc. No. 91 at 18.)

to describe the interactions between Officer Rosemon and Kenny before the shooting, she testified that Kenny had nothing in his hand, that he had his hands up until he reached the street, and that his hands were visible even when he put them down. (*Id.* at 58:23 to 59:10.) Without a doubt, it is for a jury, not the Court, to decide whether to believe Officer Rosemon or Ms. Scott.

Third, Mr. Releford has produced other evidence that casts some doubt on Officer Rosemon's credibility. According to Officer Rosemon, Kenny "paused momentarily" after being shot the first time before coming towards him again. (Doc. No. 74, Ex. A at 137:23 to 137:25; Doc. No. 83, App'x K, Ex. 28.) However, the timing of Officer Rosemon's calls to dispatch shows that at least 56 seconds, and possibly close to 70 seconds, elapsed between the first and second shots. (Doc. No. 87 at 23.) When credibility of a witness is in dispute, summary judgment is inappropriate. *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 81 (5th Cir. 1987) ("Clearly the credibility of a witness is a factual issue which precludes summary judgment.") (quoting *Cram v. Sun Ins. Office, Ltd.*, 375 F.2d 670, 674 (4th Cir. 1967)).

Defendants question the declarations because they were signed four, five, or twelve months after the shooting. In addition, Defendants take issue with the declarations containing similar or identical language when the declarants testified at their depositions that the declarations were their own words. However, those concerns are better addressed during cross-examination at trial than at the summary judgment stage.

### B.  Claims for Municipal Liability

Mr. Releford's first theory of municipal liability is that the City has "a policy or custom of finding all intentional officer-involved shootings of people to be justified." (Doc. No. 87 at 51.) By finding all shootings justified, no officers are disciplined for discharging their firearms, which creates a culture where officers use excessive deadly force with impunity. According to

11

Mr. Releford, the City's failure to find any officer-involving shootings unjustified amounts to a failure to supervise its officers on the use of deadly force. (*Id.* at 68.)

To support his theory, Mr. Releford offers the fact that the City found all officer-involved shootings of people from 2009 to 2012 to be justified, except for the three that were deemed accidental. (Doc. No. 83, App'x M, Ex. 34 at 3.) Furthermore, Mr. Releford discusses five cases, in addition to his son's, that he says illustrate the City's policy of rubber-stamping its investigations into officer-involved shootings of people. (Doc. No. 87 at 54–67.) Defendants do not dispute the facts of these other cases. The Court will briefly summarize them here. All of the shootings were deemed justified. All of the suspects were unarmed. The first case is the February 2011 shootings, during a bar fight, of brothers Omar and Ronaldo Ventura by Officer Jose Coronado, who had been drinking. Omar died; Ronaldo was wounded. Officer Coronado said Omar reached into his waistband and Ronaldo looked ready to charge at him. Other witnesses said Omar was not threatening and even that he had his hands up before being shot. The second case is the September 2012 fatal shooting of Brian Claunch by Officer Matthew Marin. Officer Gonzalo Lara was also at the scene. Mr. Claunch was confined to a wheelchair and had one leg and one arm. Officer Marin said he shot Mr. Claunch after he came at the officers really fast while making stabbing motions with a shiny metal object and cornered Officer Lara between two beds. In fact, Mr. Claunch was holding a plastic ballpoint pen. Moreover, the crime-scene photographs show his wheelchair and a puddle of blood at the foot of the bed. The third case is the July 2013 fatal shooting of Rufino Lara by Officer Jillian McGowan. Officer McGowan said that she shot Mr. Lara after she ordered him to put his hands on the wall, but he only put one hand on the wall and then turned around quickly, reaching into his waistband. Other witnesses said that Mr. Lara was very drunk and put both hands on the wall, then lifted one off the wall but

kept it in the air. The fourth case is the May 2010 shooting of Gene Horace by Officer Jason Rice. Mr. Horace was caught trying to break into Officer Rice's wife's car. Officer Rice said he shot Mr. Horace while Mr. Horace was running away because Mr. Horace turned around and started reaching into his waistband. Mr. Horace said he did not turn around or put his hands near his waist. In addition, Mr. Horace was shot in the back. The fifth case is the October 2010 shooting of Rogelio Rodriguez by Officer Rogelio Carreon. Mr. Rodriguez was caught trying to break into Officer Carreon's truck. Officer Carreon said he shot Mr. Rodriguez twice because he thought Mr. Rodriguez had something in his hand. Mr. Rodriguez then ran to his idling Chrysler and sped off. Mr. Rodriguez says he was in his Chrysler when he was shot.

Mr. Releford also provides messages sent between two officers on the night that Kenny was shot. According to Mr. Releford, these messages reveal the Houston Police Department's culture of indifference toward shootings by its officers. Officer Lara, assigned to the South Central Division of the Houston Police Department, had reported to the scene of Kenny's shooting and was still there:

| Officer Peter Buttitta: | Hey bro, can you guys go at least 2 weeks without a shooting. |
| Officer Lara: | Thats how we roll at South Central Bra! We too hard! |
| Officer Buttitta: | Hahaha right…is he DOA? |
| Officer Lara: | He was alive when enrt to hosp. |
| Officer Buttitta: | Man bra, you better be careful…the list is shortening of officers who havent gotten into a shooting yet. |

(Doc. No. 83, App'x N, Ex. 37 at 000660-RELEFORD & Ex. 38 at 7.)

Finally, Mr. Releford relies on the report of his designated expert, William Rathburn. Mr. Rathburn opines, among other things, that the City's finding 100% of shootings to be justified is "shocking," "signal[s] to officers that the [D]epartment is not really serious about holding

13

officers accountable for adhering to the shooting policy," and "communicates to officers that they can essentially shoot at will." (Doc. No. 83, App'x G, Ex. 16 at 22–23.) Mr. Rathburn testified at his deposition that Kenny's shooting and four out of five of the cases described above—the shootings of the Ventura brothers, Mr. Claunch, Mr. Lara, and Mr. Horace—were unnecessary. (Doc. No. 83, App'x G, Ex. 15 at 68:24 to 78:18.)[2]

Mr. Releford's second theory of municipal liability is that the City inadequately trains its officers on the use of force. Mr. Releford's supporting evidence consists of the deposition testimony of Officer George Guerrero, a trainer at the Houston Police Department Academy who testified as the City's Rule 30(b)(6) representative on training; Mattie Provost, the Assistant Chief of the Houston Police Department; and Officer Rosemon. Officer Guerrero testified that, to comply with the Department's policy on use of deadly force, officers must have a subjective fear of serious bodily injury that they can explain, even if that fear is unreasonable. (Doc. No. 83, App'x I, Ex. 20 at 191:15 to 194:14.) Assistant Chief Provost said that Officer Rosemon acted within the Department's policy when he shot Kenny because "he was in fear . . . of serious bodily injury or death." (Doc. No. 83, App'x I, Ex. 19 at 250:9 to 250:25.) When asked to describe his understanding of the Department's use-of-force standard, Officer Rosemon responded, "Any moment you feel threatened to your life or the life of someone else, imminent – imminent danger, you have the right to use deadly force." (Doc. No. 83, App'x A, Ex. 1 at 163:22 to 164:2.)

Defendants respond that the City's training of its officers on use of force meets or exceeds the standards set by the Texas Commission on Law Enforcement ("TCOLE"). (Doc. No. 74 at 36–37.) In addition, its training of officers for interacting with citizens who suffer from mental illness, through the de-escalation/crisis intervention training, exceeds the minimum state

---

[2] The shooting of Mr. Rodriguez was not discussed at Mr. Rathburn's deposition.

requirements. (*Id.* at 37.) According to Defendants, Mr. Releford has presented no evidence that the state standards are constitutionally infirm. As to Mr. Releford's theory that the City has failed to investigate and discipline officers who use deadly force, Defendants submit that Mr. Releford's list of 99 shootings over three years that the City found justified does not show a pattern, nor do the five other cases on which Mr. Releford relies. (Doc. No. 91 at 23.) Defendants further argue that one officer's poor training cannot result in liability and that Mr. Releford has produced no evidence that Officer Rosemon had a known propensity for using excessive force. (*Id.* at 18, 26.) Defendants have also moved to exclude or limit the testimony of Mr. Rathburn. (Doc. No. 76.)

### 1. Admissibility of Mr. Rathburn's Testimony

Defendants say that Mr. Rathburn is unqualified because he is not certified by TCOLE, has never attended the crisis intervention training, is not a psychiatrist or psychologist, and does not have training in calculating bullet trajectories or forensic pathology. Mr. Releford responds by noting that Mr. Rathburn is the former Chief of Police of the Dallas Police Department and has nearly thirty years' experience as a police officer in Los Angeles and Dallas. Since leaving the Dallas Police Department, Mr. Rathburn has worked in the private sector as a security consultant. This work has included assisting the Greek government with planning for the 2004 Olympic Games and reviewing the management of police departments. (Doc. No. 79-1 at 35.)

The Court finds that Defendants' challenge to Mr. Rathburn's qualifications is without merit. Mr. Rathburn's extensive experience in law enforcement and security renders him qualified to testify as an expert. Any specific shortcomings in Mr. Rathburn's qualifications can be addressed during cross-examination and relate to the weight, rather than the admissibility, of his testimony.

15

Substantively, Defendants argue that Mr. Rathburn's testimony is not the product of reliable principles and methods, will not aid the jury, and consists of impermissible legal conclusions. Mr. Releford responds that Mr. Rathburn's testimony is based on his personal experience. The Court agrees with Mr. Releford. The Advisory Committee notes to Rule 702 caution that the 2000 amendments in response to *Daubert* and *Kumho* were not "intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note). The Court finds that this is the type of case in which the expert's experience provides an adequate basis for his testimony. His opinions about the reasonableness of Officer Rosemon's actions and the adequacy of a police department's training of its officers are closely related to his many years of experience.

The Court further finds that the Mr. Rathburn's opinions will aid the jury and are not impermissible legal conclusions. Expert and lay witnesses may not testify as to legal conclusions. *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003). However, the distinction between permissible and impermissible opinions must be carefully made. The Fifth Circuit has provided a helpful example:

> The question "Did T have capacity to make a will?" should be excluded. The question "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" is permissible.

*Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). By analogy, neither Mr. Rathburn nor any other expert or lay witness in this case may express his or her opinion as to whether Officer Rosemon acted reasonably under the Fourth Amendment. *See Williams*, 343

16

F.3d at 435 (holding that the district court erred "by allowing the officers' testimony about the reasonableness of the shooting"). However, Mr. Rathburn may offer his opinions about how, for example, Officer Rathburn should have acted differently. Such testimony would aid the jury.

### 2.   Sufficiency of Evidence for Municipal Liability

Mr. Releford has presented sufficient evidence from which a reasonable jury could find municipal liability. Although Defendants point to a lack of any evidence that the state standards, which the City's written policies meet or exceed, are constitutionally inadequate, that argument misses the mark. Mr. Releford's theory is based on an unwritten policy or custom of finding all officer-involved shootings to be justified, and municipal liability may attach based on an unwritten policy. *See Williams v. Kaufman Cty.*, 352 F.3d 994, 1014 (5th Cir. 2003) (affirming municipal liability based on the unwritten policy for executing certain warrants by conducting strip searches of detainees with individualized suspicion).

To make their argument about the list of 99 incidents being insufficient, Defendants rely on *Oporto v. City of El Paso*, No. EP-10-CV-110-KC, 2012 WL 2191697 (W.D. Tex. June 14, 2012), *Young v. Green*, No. CIV.A. H-11-1592, 2013 WL 775388 (S.D. Tex. Feb. 28, 2013) (Rosenthal, J.), and *Peterson v. City of Fort Worth*, 588 F.3d 838, 857 (5th Cir. 2009). These cases are distinguishable.

In *Oporto*, the plaintiffs argued that the City of El Paso had a policy of using excessive force during arrests or investigatory stops. 2012 WL 2191697, at *4. The district court found that plaintiffs had no evidence of a pattern based on 32 incidents in 15 years where officers had allegedly used excessive deadly force and 104 complaints of excessive force in one year. *Id.* at *5. The plaintiffs had "failed to provide any evidence to substantiate these allegations." *Id.* Here, Mr. Releford relies on more than a list. He has provided the factual details of the five other cases

17

and the opinion of Mr. Rathburn criticizing the policy of finding all shootings to be justified.

In *Young*, the plaintiffs' theory of municipal liability relied on, in relevant part, the fact that 170 people were shot by Houston Police Department officers from March 2005 to 2010, all but two were deemed justified, with the remaining two classified as "accidental" or "information," with no explanation of the latter term. 2013 WL 775388, at *20. The district court found this evidence lacking because the case at hand "did not involve a shooting and . . . the investigation sustained the complaint [of excessive force] against the officer." *Id.* In stark contrast, the case before this Court involves a shooting and a finding that it was justified.

In *Peterson*, the plaintiff alleged that the City of Fort Worth had a policy of permitting excessive force in making arrests. 588 F.3d at 850. To establish municipal liability, he pointed to 27 complaints of excessive force over four years. *Id.* at 852. Four of these complaints were sustained. *Id.* The Fifth Circuit found that the plaintiff had produced insufficient evidence, but thought the relatively small number of sustained complaints "may tilt in [the plaintiff's] favor." *Id.* One of the problems with the plaintiff's evidence was that it lacked context by not providing the number of arrests during the four-year period, although the court noted that more than 67,000 crimes had occurred in the previous year alone as a point of comparison. *Id.* Mr. Releford's evidence is stronger than the evidence in *Peterson*. His evidence shows zero findings of unjustified shootings from 2009 to 2012. Moreover, the 99 incidents is a complete list of officer-involved shootings of people who were killed or injured during that time period.

The Court also finds unpersuasive Defendants' argument regarding a single officer's bad training and Officer Rosemon's lack of propensity for using excessive force. Mr. Releford does not rely on a single officer's training. Rather, he has produced the additional evidence from Officer Guerrero and Assistant Chief Provost. Moreover, his theories of municipal liability do not

18

depend on one officer's known propensity but instead rest on examples of deadly force used by various officers.

### C. Damages

Defendants contend that Mr. Releford's claims against them under the Texas Wrongful Death/Survival Statute should be dismissed as barred by governmental immunity. Mr. Releford argues in response that his second amended complaint references the Texas Wrongful Death/Survival Statute only as a guide for the damages that he may recover. *See Grandstaff v. City of Borger*, 767 F.2d 161, 172 (5th Cir. 1985) ("We look to Texas law for guidance on the damages recoverable for [the plaintiff's son's] death.") The Court agrees with Mr. Releford. The Fifth Circuit has held that Texas law, as incorporated by § 1988 into § 1983, permits a parent "to recover under § 1983 for [his or] her own injuries resulting from the deprivation of [his or] her son's constitutional rights." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 391 (5th Cir. 1992).

## V.   CONCLUSION

For the reasons above, Defendants' motion for summary judgment and motion to exclude expert testimony are **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 29th day of February, 2016.

THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

19